BILAL A. ESSAYLI
United States Attorney
CHRISTINA T.SHAY
Assistant United States Attorney
Chief, Criminal Division
TIMOTHY J. SEARIGHT (Cal. Bar No. 151387)
THOMAS J. MAGANA (Cal. Bar No. 324542)
Assistant United States Attorneys

    312 N. Spring Street
    Los Angeles, CA  90012
    Telephone:  (213) 894-3749/(213) 894-1344
    E-mail:  timothy.searight@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>JESUS ESTEBAN FELIX, JR.,<br>  Aka Jesus Felix Alvarez,<br><br>        Defendant. | No. CR 12-527-GW<br><br>OPPOSITION TO DEFENDANT JESUS ESTABAN FELIX, JR.'s MOTION TO SUPPRESS WIRETAP EVIDENCE<br><br>Hearing Date: June 23, 2025<br>Hearing Time: 8:00 a.m.<br>Location:    Courtroom of Hon. George H. Wu |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California, and Assistant United States Attorneys Timothy J. Searight and Thomas J. Magana, hereby files its Opposition to Defendant Jesus

///

///

///

///

///

///

///

Esteban Felix, Jr.'s, Motion to Suppress Wiretap Evidence.

This Opposition is based upon the attached memorandum of points and authorities, with Exhibits, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated:  May 16, 2025                Respectfully submitted,

BILAL A. ESSAYLI
United States Attorney

CHRISTINA T. SHAY
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
TIMOTHY J. SEARIGHT
THOMAS P. MAGANA
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

## MEMORANDUM OF POINTS AND AUTHORITIES

I.    INTRODUCTION

Defendant Jesus Esteban Felix Jr. ("defendant") has filed a motion to suppress wiretap interceptions of Blackberry messages ("BBMs"). Defendant raises five arguments in support of his motion.

First, defendant asserts that there was not probable cause for the first wiretap order, that information provided by a confidential source ("CS") was "stale." (Def. Mot., p. 9.) Defendant requests a Franks hearing. (Id., p. 26.) What defendant fails to mention, however, is that, in the month before wiretap authorization, agents obtained search warrants for BBM content on each of the devices. This content revealed numerous drug-related conversations on the devices, including on Target Account #3 which was used by defendant. Defendant does not challenge this content obtained shortly before wiretap authorization and he, therefore, is not entitled to a Franks hearing.

Second, defendant asserts that there was not statutory "necessity" for wiretap interceptions. He argues primarily that undercover officers could have been used to make controlled purchases from the narcotics distribution group. He also argues that, in subsequent affidavits, there was an improper incorporation of previous affidavits and that the affidavits used "boilerplate" language in examining necessity. (Id., pp. 11, 22.) In this case, defendant, Krokos and defendant's father remained in Mexico directing drug activities throughout the investigation, such that surveillance, "controlled buys," and other techniques would have had limited efficacy. These facts and limitation remained the same as presented in subsequent wiretap applications and affidavits.

Third, defendant argues that there was inadequate minimization of intercepted BBMs by law enforcement. Defendant, however, does not make any specific allegations of failed minimization. (Id., p. 25.) As mentioned in the affidavits, a "filter" team was used in the investigation, and not all BBMs were passed on to the investigative agents.

Fourth, defendant argues that defendant was in Mexico when using the Blackberry devices and, therefore, the authorizing court did not have territorial jurisdiction over the intercepted devices. (Id., p. 24.) The BBMs, however, passed through the United States private server of CorCorp, Inc. and the "listening post" for the interceptions was in the Central District of California.

Fifth, and lastly, defendant argues that Corcorp, Inc. had a contract with the federal government, and provided interception, decryption and location services in the investigation. Defendant fails, however, to frame a cohesive argument on the point. Such services were only provided pursuant to court ordered search warrants and wiretap orders. (Id. at 27-28.)

Defendant's motion should be denied.

II. STATEMENT OF FACTS

The initial wiretap, at which defendant directs most of his arguments, was signed on July 13, 2010 by the Honorable Percy Anderson, United States District Judge. The order was supported by an application and affidavit of Special Agent Rachel Burkdoll with the Drug Enforcement Administration ("DEA"). A copy of the application and affidavit is attached hereto as Exhibit A. Judge Anderson also authorized subsequent wiretap interception orders in

2

the investigation. See, CR Misc. Nos, 10-205 through 10-205(O).[1] The wiretap order was for the interception of three "Target Accounts." Target Account 1 was believed to be used by co-defendant John Krokos; Target Account 2 was believed to be used by co-defendant Ismael Ichiro; Target Account 3 was believed to be used by defendant. All three accounts were identified by electronic serial numbers and addresses, and were serviced by "CorCorp, Inc., located in Herndon, Virginia." (Exh. A, ¶ 4.)

### A.    Probable Cause

After recounting training and experience, SA Burkdoll set-forth probable cause for the interception of the three devices.

SA Burkdoll stated that, at the beginning of 2009, she was provided intelligence information about drug distributors in Mexico from Detective Fontecchio of the San Luis Obispo Sheriff's Department. (Exh. A, ¶ 13.) The information came from a long-time CS working with Detective Fontecchio, and the information provided was primarily telephone numbers. SA Burkdoll obtained information for the phone numbers, but observed that many were active for only short periods of time. (Id.) In August of 2009, Detective Fontecchio provided information from the CS about a drug seizure from the narcotics group at the Canadian border that SA Burkdoll was able to partially verify. (Exh. A, ¶¶ 14-15.)

---

[1]    Before signing the initial order, the Court (the Honorable Percy Anderson) requested briefing on whether the providing of Blackberry Messages was more appropriately pursued through the Stored Communications Act, 18 U.S.C. § 2703(d), as opposed to the Wiretap Act ("Omnibus Crime Control and Safe Streets Act") of 18 U.S.C. 2510, et seq. The government provided briefing on July 13, 2010 (Exhibit B, attached hereto) and the Court subsequently signed the initial order.

3

In September and October of 2009, SA Burkdoll, with Detective Fontecchio, had meetings with the CS. The CS allowed SA Burkdoll to see and access BBMs on the CS phone. (Id. ¶ 16.) The CS related that defendant's father, co-defendant Felix (who is now deceased), imported cocaine from Colombia to Mexico and worked with a transportation ring in Los Angeles to receive the cocaine before having it move further to Canada. (Id. ¶¶ 16-17.) In the Target Subjects portion of the affidavit, SA Burkdoll related that Felix had felony narcotics convictions from 1999 and 2004. (Id. ¶ 11b.) SA Burkdoll also related that Felix had been the subject of state-authorized wiretaps in 2006. Felix had initially agreed to cooperate with law enforcement, but then had fled the country. (Id., ¶ 12a-d.) The CS related that proceeds from the drug sales were transported from the United States and Canada to Tijuana for counting and delivery. (Id. ¶ 16.) The CS identified three of the Canadian distributors as Gordon Kendall, Jeffrey Ivans and (co-defendant) John Krokos. (Id. ¶ 17.) Working with Google maps, the CS showed SA Burkdoll and other agents various locations the CS believed were associated with the group. (Id. ¶ 18.) On the CS's EBD, SA Burkdoll observed what appeared to be drug related emails with both Kendall and Krokos. (Id. ¶¶ 19, 20, 21.) The persons did not use their actual names in the email exchanges, but instead used email names and monikers. (Id.) The CS attempted to introduce Detective Fontecchio, working undercover and remotely in the Los Angeles area, to the group as a person who was both interested in buying narcotics from the group and who could supply EBDs to them. (Id. ¶ 29.)

As related by SA Burkdoll in the affidavit, it was reported in Mexico and Canada media that on September 27, 2009, Kendall and Ivans

4

were assassinated outside a condominium complex in Puerto Vallarta, Mexico. (Id. ¶ 27.) In the affidavit, SA Burkdoll related that, two days before, "Kendall and Jeffrey Ivans allegedly visited [co-defendant] Felix at his ranch in Culiacan, Mexico where they argued about the quality of cocaine that they had received in a prior shipment." (Id.)

In the affidavit, the CS had little to say about defendant. The only statement about defendant that is attributed to the CS is as follows: "Alvarez [defendant] is currently living in Culiacan, Mexico, and is the son of Felix and Delia Alvarez according to CS#1. CS#1 described Alvarez as approximately 17 years old, 5'8" tall and approximately 180 pounds." (Id. ¶ 11d.)

After the death of Kendall and Ivans, co-defendant Krokos stopped using the EBDs that he had been using. Approximately 10 days after the deaths, co-defendant Krokos contacted Detective Fontecchio in California from Mexico to discuss both potential drug sales and the providing of new EBDs to Krokos. (Id. ¶ 29.) In the conversation, Krokos asked Detective Fontecchio to send four EBDs to Mexico, and Krokos stated, "You're obviously going to keep one of the berries with you." (Id. ¶ 29.) SA Burkdoll then obtained five Blackberry devices from a Canada company, "Phantom Secure," and sent four of the devices to Krokos at a DHL facility in Puerto Vallarta. (Id. ¶ 30.)[2]

---

[2]    In 2019, the operators of Phantom Secure, a Canada-based company, became the subjects of a federal indictment for knowingly providing encrypted devices to drug and criminal organizations. See, www.justice.gov/usao-sdca/pr/chief-executive-communications-company-sentenced-prison-providing-encryption-services.

Assuming the undercover identity begun by Detective Fontecchio, and holding the fifth EBD, SA Burkdoll engaged in a first email exchange with Krokos on November 10, 2009.  (Id. ¶ 31.)  In the remaining weeks of 2009, and into 2010, SA Burkdoll and Krokos had several conversations about Krokos providing drugs.  (Id. ¶¶ 31-35.)

In January 2010, Krokos said in an email string that he needed to renew the service for the EBDs.  (Id. ¶ 36.)  Krokos agreed to send an associate to meet in Los Angeles, and provide $1,200 to renew the service.  (Id. ¶¶ 36-37.)  On January 7, 2010, after coordinating messages on the EBDs, Detective Fontecchio, in an undercover capacity, met for the first time with co-defendant Ichiro in the parking lot of a Home Depot store in Los Angeles and received the funds to renew the service contracts on the devices.  (Id. ¶ 40.) SA Burkdoll related that Ichiro, as a Los Angeles-based operative for the group, proved to be adept at thwarting surveillance through countersurveillance driving.  (Id. ¶ 94.)  Eventually, however, through visual and GPS surveillance, agents were able to observe that he lived at a residence in La Puente, California.  (Id. ¶ 48.)

Because the private service provider, Phantom Secure, was located in Canada, agents were only able to obtain communications from Krokos with themselves on the two devices (that held by Krokos and the device held by the agents).  (Id. ¶ 31, n. 12.)  They did not have communications from Krokos to others, or on the other three devices sent to Mexico.  (Id.)

On February 24, 2010, however, Krokos sent a message to the undercover device that stated, "I need 4 berrys bro . . . Berrys and service for 6 months how much?"  (Id. ¶ 41.)  Arrangements were again made for Detective Fontecchio to meet with Ichiro at the same Home

6

Depot parking lot.  (Id. ¶ 44.)  On this occasion, SA Burkdoll obtained four Blackberry devices served by a United States based private server company, CorCorp, Inc.[3]  (Id. ¶ 4.)  The devices were provided to Ichiro on March 11, 2010.  (Id. ¶ 46.)  One of these devices was for Target Account #3 used by defendant, and later subject to interceptions.  (Id. ¶ 4c.)  In April 2010, at the request of Krokos, SA Burkdoll sent two more EBDs, serviced by CorCorp, Inc. to the DHL location in Puerto Vallarta.  (Id. ¶¶ 52-53.)

On May 4, 2010, the Honorable Victor B. Kenton, United States Magistrate Judge, signed search warrants for stored email communications from the six devices with associated email addresses and directed to CorCorp, Inc.  (Id. ¶ 58.)  A "filter" group was used to initially review the messages before sending those that were pertinent to the investigative agents.  (Id. ¶ 59.)  SA Burkdoll stated in the wiretap affidavit, "I have reviewed all of the messages that were sent to me.  Out of the hundreds of pertinent messages, I have selected several which I believe best reveal the scope of the organization's narcotics trafficking activities."  (Id. ¶ 59.)

As to Target Account #1, being used by Krokos, apart from the content revealed by the search warrant, Krokos communicated directly with SA Burkdoll with the device.  (Id. ¶ 4, n. 2.)  In one conversation with the agents, Krokos stated, "We talked to ride guy he says were close to hopping he will let me know when u will . . u will have notice but is 100% he's even got parts with him."  (Id.

---

[3]    As defendant has noted in his motion, CorCorp, Inc., was a private company with contracts with the federal government.  (Def. Mot., pp. 27-28.)  CorCorp was able to provide GPS data, stored content and decrypted communications on the devices in response to lawful service.

7

¶ 57.)  On Target Account #2, being used by Ichiro, there were numerous drug-related conversations.  (Id. ¶¶ 60-64.)

For Target Account #3, being used by defendant, the search warrant revealed several drug-related conversations.  On April 21, 2020, Krokos asked defendant, "So there will be no work now, right buddy?"  On April 22, 2010, defendant responded, "Wait.  It looks like we are going to work today.  And also later on I will deposit 2000 so you can help yourself to eat." (Id. ¶ 64.)  Krokos later responded to Target Account #3, being used by defendant, "Ok.  It looks great buddy.  When do you think we can start?"  Defendant responded, "It's going to be tomorrow, buddy.  They are going to send you 1000 right now and 100 tomorrow."  (Id. ¶ 65.)

The next day, on April 23, defendant from Target Account #3 told Krokos, "We were robbed at the border but they are going to cross tonight."  Later, a message was sent from Target Account #3 to Krokos that stated, "Chill out buddy.  We are going to work on Monday. Enjoy your weekend we will work on Monday."  (Id. ¶ 66.)

SA Burkdoll pointed out in the affidavit that the messages from Krokos (on Target Account #1) to and from defendant (on Target Account #3) were in English, and defendant would, in turn, communicate with his father in Spanish.  SA Burkdoll stated that it appeared that defendant was acting as a translator between Krokos and his father, Felix.  (Id. ¶¶ 64a, 65, 66.)  In the listing of defendant in the Target Subjects portion of the affidavit, SA Burkdoll stated, "Based on encrypted emails that I have read, I believe that Alvarez [defendant] works as a translator for his father, Felix.  (Id. at 11d.)

## B.    Necessity

In the "necessity" section of the wiretap affidavit, SA Burkdoll stated the reasons why traditional law enforcement techniques would not meet the goals of the investigation. (Id. ¶ 76.)  The primary reasons why traditional law enforcement techniques were ineffective, as described in the affidavit, were that (1) Krokos and defendant (the users of two of the three Target Accounts and devices) were located in Mexico, and (2), Ichiro, the user of the third Target Account and the Los Angeles operative who picked-up the EBDs, was highly adept at counter-surveillance driving.  As to Ichiro, SA Burdoll stated,

> After the meeting with Detective Fontecchio on March 11, 2010 [in which the service for EBDs sent to Mexico was provided by Ichiro at the Home Depot parking lot], surveillance units again followed Ichiro to identify his residence.  After the meeting, Ichiro was observed driving well under the speed limit on the 101 Freeway.  This made surveillance extremely difficult as Ichiro was driving so slow that vehicles had to pass him.  Any vehicle that remained behind him would have been compromised.  Furthermore, when Ichiro later exited another freeway close to his residence, he drove behind a strip mall and then took an indirect route to his residence.

(Id. ¶ 97.)  SA Burkdoll described in series traditional law enforcement techniques attempted or considered, and why they had not or would not meet the goals of the investigation.

The first technique described, and a focus for defendant in his motion, was the use of the CS in Mexico and undercover officers (Detective Fontecchio and SA Burkdoll) in California.  As to the CS, the affidavit stated that the CS "was used at the beginning of this investigation to provide information regarding the narcotics trafficking activities of Krokos and Felix." (Id. ¶ 80.)  The CS stated that the CS "had been working with Felix [defendant's father]

9

who had the capability to distribute 1,000 kilograms of cocaine per week." (Id. ¶ 16.) As related in the affidavit, however, in the Fall of 2009, the CS reported that Felix threatened to kill the CS. (Id. ¶ 81.) This came at approximately the same time as Gordon Kendall was murdered in Puerto Vallarta. (Id. ¶ 27.) As related in the affidavit, SA Burkdoll observed on the Blackberry device of the CS communications with Krokos and communications involving Kendall. (Id. ¶¶ 20, 21.) In addition, the CS provided information about a quantity of drugs seized from a truck at the United States-Canada border. (Id. ¶¶ 14, 15.) When SA Burkdoll was able to identify the seizure, the officer at the border said that he attempted to speak with the driver, and SA Burkdoll related that the driver "refused to provide any information to law enforcement as he stated that he would be killed if he did so." (Id., ¶ 15.) SA Burkdoll stated that, as a result of the threat, the CS "is no longer in a position to provide timely information regarding Krokos' Organization." (Id. ¶ 81.) SA Burkdoll also noted that the group substantially "compartmentalized" information, and that the CS was not privy to details about the storage of money in Mexico or when drugs would enter the United States. (Id. 82.)

The CS was used to introduce an undercover officer by passing an undercover telephone number to Krokos. (Id.) Thereafter, and for the next approximate six months, the undercover officer and agent had Blackberry message exchanges with Krokos in Mexico. (Id. ¶ 84.) Although there were multiple discussions about Krokos providing drugs, none of these discussions came to fruition primarily because Krokos wanted to supply greater quantities of MDMA tablets than agents could reasonably purchase. (Id. ¶ 93.) SA Burkdoll stated

that Krokos seemed to view the undercover operatives as a United States source for EBDs.  SA Burkdoll stated, "I believe that Krokos views the undercover relationship that we have fabricated as valuable to him for the limited purpose of securing these difficult to obtain EBDs for his organization."  (Id. ¶ 84.)  Krokos provided little detail about the drug organization.  (Id. ¶¶ 84, 85.)

As to co-defendant Ichiro, a coordinator of drugs and cash in Los Angeles, agents conducted both visual and GPS electronic visual surveillance of him.  Although visual surveillance was attempted, SA Burkdoll related that Ichiro employed a variety of countersurveillance techniques.  (Id. ¶ 97.)  SA Burkdoll stated, "Because of Ichiro's propensity to conduct countersurveillance maneuvers, I believe that it is too risky to continue following him without the aid of electronic interception."  (Id. ¶ 99.)  Agents attempted to obtain GPS data from a cellular telephone used by Ichiro that had been used to coordinate the meeting with Detective Fontecchio, but SA Burkdoll related that the telephone was used "sporadically and turned off when not in use thereby thwarting attempts to locate the device."  (Id. ¶ 96.)

For the Blackberry device associated with Target Account #2, used by Ichiro, it was tracked on one occasion to the United States-Mexico border, and then reappeared in Culiacan, Mexico, but there was no ability of the agents to conduct visual surveillance in Mexico. (Id. ¶ 98.)  By the time of the wiretap application, agents had identified the residence of Ichiro.  Although Ichiro was plainly associated with and an operative of the group, SA Burkdoll did not believe probable cause existed that narcotics or narcotics proceeds would be at the residence.  (Id. ¶ 118.)  In addition, conducting a

search warrant at Ichiro's residence would have plainly revealed the investigation. (Id. ¶ 120.) As to a trash search, SA Burkdoll related that there were no trash cans in a place where they could be removed without observation. (Id. ¶ 133.)

SA Burkdoll listed approximately six pen register orders that were obtained prior to the application for wiretap interception. (Id. ¶¶ 103-108.) Pen registers were obtained for the Subject EBDs and several other devices. SA Burkdoll related, however, that pen registers were particularly problematic for EBDs. SA Burkdoll stated that the email names "are not created by the user and bear no association or indication who is using the EBDs." (Id. ¶ 110.) All the pen registers showed was that one EBD was communicating with another EBD. (Id.) Cellular telephones were used only for short periods of time. (Id. ¶¶ 13, 103, 115.) SA Burkdoll related that what the pen registers primarily showed was that devices were active, and this did not greatly further the investigation. (Id. ¶ 110.) Search warrants for the Target Accounts were effective to establish that Krokos, Ichiro and defendant were engaged in drug activity. The search warrants, however, did not reveal contemporaneous activity for the group and, therefore, was not actionable such that surveillance leading to seizures could be made. (Id. ¶¶ 125, 126.)

## III. ARGUMENT

### A. Defendant Has Failed To Establish Standing to Challenge the Wiretap Orders

In this case involving Blackberry messages, defendant has failed to submit a declaration asserting that he was the person sending and receiving the messages. He relies entirely on the argument that he

was a Target Subject listed in the wiretap documents. (Def. Mot., pp. 16-17.)

In Alderman v. United States, 394 U.S. 165, 176 (1969), the Supreme Court interpreted the requirement of "standing" in the context of wiretaps to be consistent with the rules for determining standing to contest the admissibility of evidence derived from the execution of a search warrant. The Ninth Circuit has stated, "[A] defendant may move to suppress the fruits of a wiretap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises." United States v. King, 478 F.2d 494, 506 (9th Cir. 1973). United States v. Jabara, 618 F.2d 1319, 1325 (9th Cir. 1980).

This District has a Local Rule that applies to all motions to suppress. Specifically, Local Rule 12-1.1 provides:

> A motion to suppress shall be supported by a declaration on behalf of the defendant setting forth all facts then known upon which it is contended the motion should be granted. The declaration shall contain only such facts as would be admissible in evidence and shall show affirmatively that the declarant is competent to testify to the matters stated therein.

See also, United States v. Wardlow, 951 F.2d 1115, 1116 (9th Cir. 1991)(proper for district court to deny motion to suppress without evidentiary hearing where defendant failed to property comply with applicable local rule).

Defendant argues, "A person has standing to suppress communications if he is named in the surveillance order whether or not he was a participant in the intercepted communication," and cites United States v. Oliva, 705 F.3d 390 (9th Cir. 2012). It is correct that Title 18, United States Code, Section 2518(10)(a) provides: "Any aggrieved person . . . may move to suppress the contents of any wire

13

or oral communication intercepted pursuant to this chapter . . . ." The term "aggrieved person" is defined at § 2510(11) as: "a person who was a party to any intercepted wire, oral, or electronic communication *or a person against whom the interception was directed*." (emphasis added). The <u>Oliva</u> case, however, did not modify this Circuit's case law as stated in <u>United States v. King</u>, <u>supra</u>, and it could not have modified the Supreme Court's ruling in <u>Alderman</u>. <u>United States v. Matsura</u>, 129 F.Supp.3d 975, 980 (S.D.C. 2015)("The Ninth Circuit did not 'implicitly overrule' its previous case law in <u>Oliva</u>, as defendants suggest, nor did it adopt a 'per se rule of standing to a defendant merely because he is the target, rather than the victim, of a search and seizure.'") The language of <u>Olivas</u> did not, and cannot, alter the parameters articulated by the Supreme Court for wiretap "standing."

In this case, persons used email monikers in their communications. Defendant has failed to establish that he was, in fact, the person intercepted on Target Account #3, or in other communications on other devices.

**B.    The Wiretap Was Supported by a Showing of Probable Cause**

1.    Probable Cause

Defendant's argument as to probable cause is that the statements from the CS were "stale and false." Defendant states, "The information was stale in that CS-1 last saw Felix Jr. [defendant] in Mexico when Felix Jr. was about 15 years old. Felix Jr. did not see or talk to CS-1 after then. And Felix never discussed working together in the drug trade with CS-1." (Def. Mot., p. 9.)

On the facts, what is wrong with defendant's argument is that he does not point out where in the wiretap affidavit he finds these

14

statements from the CS.[4]  In the wiretap affidavit, the statement by the CS about defendant is in the Target Subjects description.  It states, "Alvarez [defendant] is currently living in Culiacan, Mexico, and is the son of [co-defendant] Felix and Delia Alvarez according to CS-1.  CS-1 described Alvarez as approximately 17 years old, 5'8:" tall and approximately 180 pounds."  (Exh. A ¶ 11d.)  Defendant does not dispute this information, and there was nothing about it that was "stale."

Probable cause for the interception of Target Account #3 came from the search warrant for the content of Target Account #3.  As described above, there were messages in which defendant was communicating with Krokos (who spoke English) and appeared to be translating drug conversations for his father (who spoke Spanish).  (Exh. A, ¶¶ 64-67.)  Those occurred in April 2010, less than three months before the wiretap affidavit and application were submitted on July 13, 2010. (Id.) Defendant disputes that he was involved in the "drug trade" with his father, but translating messages back and forth from Krokos to his father would constitute such involvement.

An authorizing judge's finding of probable cause is "paid great deference by reviewing courts." Illinois v. Gates, 462 U.S. 213, 236 (1983).  A wiretap will be upheld on a motion to suppress if, "looking only at the four corners of the wiretap application," there is a "substantial basis" for it.  United States v. Meling, 47 F.3d 1546, 1551 (9th Cir. 2005).  Indeed, even in cases where "it may not be easy to determine when an affidavit demonstrates the existence of

---

[4]    It is in extradition proceedings, more than 10 years later (and that is the subject of a different motion by defendant to dismiss Count Two of the indictment) that the CS submitted a declaration about actions by defendant in Mexico.  (CR 1114).

15

probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." Gates, 462 U.S. at 237, n.10; United States v. Kelley, 482 F.3d 1047, 1051 (9th Cir. 2007). A court should find probable cause for wire interception if the totality of the circumstances demonstrates that there is a "fair probability," not a certainty, that the target is using the particular telephone in furtherance of the stated illegal activity. Gates, 462 U.S. at 238.

Defendant entirely fails to explain why the stored communications involving drug activity for Target Account #3 from April 2010 were not sufficient to support probable cause for the wiretap applied for a few weeks later, in July 2010.

2.  Defendant Is Not Entitled to a *Franks* Hearing

For similar reasons, defendant is not entitled to a Franks hearing. In requesting a hearing, defendant states "the affiant should testify, along with CS-1." (Def. Mot., p. 15.) Defendant again points to the extradition declaration from the CS signed in 2022, many years after the wiretap affidavit was submitted.

To be entitled to a Franks hearing, a defendant must make a "substantial preliminary showing" of intentionally false or reckless statements by the affiant that are material to the finding of probable cause. That is, "if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." Franks, 438 U.S. at 171-72. A defendant is entitled to a Franks hearing when he makes "a substantial preliminary showing that the affidavit contains deliberate or reckless omissions of facts that tend to

16

mislead." United States v. Collins, 61 F.3d 1379, 1384 (9th Cir. 1995). A defendant seeking a Franks hearing must (1) allege specifically which portions of the warrant affidavit are claimed to be false; (2) contend that the false statements or omissions were deliberately or recklessly made; (3) provide a detailed offer of proof, including affidavits; (4) only challenge the veracity of the affiant; and (5) show that the challenged statements are necessary to find probable cause. United States v. DiCesare, 765 F.2d 890, 894-95 (9th Cir.), amended, 777 F.2d 543 (9th Cir. 1985).

As stated, there is scant information about defendant from the CS in the wiretap affidavit from the CS. Information in support of probable cause came from the fact that Krokos requested the devices to use in furtherance of drug activities, and the search warrant for each of the Target Accounts, including Target Account 3, showed substantial and recent drug messaging. Defendant does not controvert this evidence in any way, and certainly has not made a "substantial preliminary showing" of falsity.

**C.    The Wiretaps Were Supported by Showings of Necessity**

In the argument portion of defendant's motion, he advances two techniques he believes that the government might have used to greater effect to meet the goals of the investigation. He asserts that undercover operatives and the CS could have been used to penetrate the group, and that pen registers and trap and trace devices could have been used to identify other participants in the conspiracy. (Def. Mot., pp. 23-24.) Defendant also asserts that the government used "boilerplate language" in the initial and subsequent wiretap affidavits, and that the wiretap affidavits paint the goals of the

17

investigation so broadly as to not be attainable.  (Id. at pp. 22-23.)

With respect to wiretap necessity, the Ninth Circuit has repeatedly held that the government must only show that "ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time" and that "law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap." United States v. Bennett, 219 F.3d 1117, 1122 (9th Cir. 2000).

The obvious reasons for wiretap necessity in this case were that Krokos, defendant's father, and defendant, were located in Mexico. No doubt a primary purpose of their being in Mexico was to avoid surveillance by United States law enforcement.  At least at the time of the wiretap affidavit, Ichiro was the group's primary operative and distributor in Los Angeles.  As the necessity section detailed, however, he was skilled at countersurveillance to the point at which, at that early part of the investigation, agents were concerned about detection. (Exh. A ¶¶ 95-97.)

As to the use of undercover agents, that is Detective Fontecchio and SA Burkdoll, and by the time of the submission of the wiretap application, agents had been interacting with Krokos via Blackberry messaging for many months.  SA Burkdoll related that the interactions had evolved little beyond Krokos viewing them as a United States source for encrypted Blackberries.  The agents never saw Krokos, Felix or defendant in the United States.  (Exh. A ¶ 84.)  Krokos was diligent in maintaining arms' length distance from them.  There were numerous discussions about Krokos supplying drugs to the undercover agents, but Krokos did not want to work with the smaller amounts

18

proposed by them.  (Id.)  As to the use of the CS (somewhat in contradiction to defendant's arguments about the reliability of the CS), defendant argues that that CS might have been used to greater effect.  (Def. Mot., pp. 23-24.)  It is important to note that, after the CS reported a death threat by Felix in the fall of 2009, CS did not state that the CS could have no contact – visual or indirect – with the group.  What the affidavit states is, after the threat, "CS-1 is no longer in a position to provide timely information regarding Krokos' organization."  (Exh. A ¶ 81.)  SA Burkdoll also noted that the organization "compartmentalized" information and gave as an example that, in the past, when the CS heard that money was arriving in Tijuana to the group, the CS did not know the location where it would be.  (Id. ¶ 82.)  In addition, there were severe limitations on acting on the information in Mexico.  (Id. ¶ 99.)  Both the death threat from Felix and the CS's relationship to Krokos, a Canadian citizen in Mexico, severely limited the efficacy of the CS.

Defendant also faults the government for using "boilerplate" language in the necessity section of the affidavit, and asserts the government set the goals of the investigation impossibly high. Defendant, however, fails to identify the sections of affidavits he believes were "boilerplate."  The need for wiretap interception in an investigation of an organization entrenched in Mexico, but stretched out to do distribution in Los Angeles and Canada seems relatively clear.  Many of the limitations of traditional law enforcement techniques to investigate such a transnational group remained the same from affidavit to affidavit.  Defendant does not point to any specific error or to why further attempt at exhaustion techniques was needed.

19

**D.    The Agents Properly Minimized Intercepted Communications**

In a short argument, defendant summarily asserts that, "Efforts at minimization of the intercepted emails were wholly inadequate. The orders were inadequate.  The implementation was inadequate." (Def. Mot., p. 12.)  Defendant offers nothing in support of the argument.  He notes that, in the government's discovery productions, there are eleven minimization memos included, but the first memorandum is missing.  Defendant argues that the "minimization memoranda that exist do not contain actual criteria, but only refer to the lengthy and confusing affidavit and order."  (Def. Mot., p. 13.)

The Ninth Circuit has recognized that "minimization requires that the government adopt reasonable measures to reduce to a practical minimum the interception of conversations unrelated to the criminal activity under investigation while permitting the government to pursue legitimate investigation."  United States v. Torres, 908 F.2d 1418, 1423 (9th Cir. 1990).  Where, as here, defendant "do[es] not challenge the admission into evidence of any intercepted conversations on the ground that those conversations should have been minimized, [this Court] need only examine whether the government has shown a prima facie case of compliance with the minimization requirement."  United States v. Rivera, 527 F.3d 891, 904 (9th Cir. 2008).  The government can make this prima facie case through showing, inter alia, that all monitors were required to read the supporting application and affidavit, to read a set of minimization instructions, to listen to minimization instructions delivered by the investigating AUSA, and to operate under the supervision of an experienced agent.  Id.

20

In *Rivera*, the Ninth Circuit recognized the adequacy of a minimization protocol described as follows:

> All agents working on the case and all monitors were required to read [the underlying affidavit], the court order for the wiretap, and the minimization memorandum written by [the] AUSA . . . moreover [the] AUSA . . . personally instructed all agents and monitors present on the first day of the wiretap and he made efforts to speak by telephone with the monitors who began working after the first day.  In addition, a DEA agent sat down with each new monitor, had him read the affidavit, the court order and the minimization memorandum, asked him whether he had any questions, and had him confirm by signature that he had read the instructions.

*Rivera*, 527 F.3d at 904.  Similarly, in *United States v. Torres*, 908 F.2d at 1423, the Ninth Circuit recognized the adequacy of minimization procedures:

> Monitoring agents were instructed on the requirements and need for minimization.  They were also required to read and sign a typed copy of minimization guidelines.  Furthermore, a DEA agent and an Assistant United states Attorney made themselves available on a twenty-four hour basis for consultation.

*United States v. Torres*, 908 F.2d 1417, 1423 (9th Cir. 1990).

The government has provided defendant with a plethora of minimization memos and documents prepared in the course of wiretap interception.  These include approximately 10 minimization memorandums and 15-reports summarizing interceptions.  Some of these documents, as illustrative examples, are attached hereto.  These procedures are nearly, if not completely, identical to those approved in both *Rivera* and *Torres*.  Defendant has not pointed to a particular case in which minimization was not appropriately accomplished let alone a pattern of failures.  Defendant argues only summarily that minimization efforts were "inadequate."  Defendant has brought forth no facts indicating that minimization occurred other than in the

21

manner instructed in the application and affidavit, and every indication is that minimization occurred in conformance with statute and the Court's orders.

### E.    The Wiretap Interceptions Occurred Within the United States

Defendant argues that, at the time of wiretap interceptions, he and other defendants were residing in Mexico.  Defendant asserts, therefore, that there was not territorial jurisdiction to intercept email communications "originating" in Mexico.  (Def. Mot., p. 25.) Defendant also asserts, somewhat in contradiction, that the point of initial wiretap interception was at CorCorp, Inc. in Virginia, and therefore it was inappropriate for a court in the Central District of California to authorize wiretap interception.  (Id.)

As defendant seems to acknowledge, however, electronic messages with the devices did pass through the United States.[5]  (Def. Mot., p. 25.)  Therefore, at least in Virginia and California, territorial jurisdiction existed, and the provisions of 18 U.S.C. §§ 2510 et seq. applied.

The case law is well-settled that the interception occurs either where the phone is located or where the "listening post" is located. United States v. Luong, 471 F.3d 1107, 1109-10 (9th Cir. 2006).  See also, United States v. Cano-Flores, 796 F.3d 83, 87 (D.C. Cir. 2015); United States v. Henley, 766 F.3d 893, 911-12 (8th Cir. 2014);  United States v. Denman, 100 F.3d 399, 402-03 (5th Cir.

---

[5]    If defendant was correct, and the messages were not intercepted in the United States, then the wiretap statute of 18 U.S.C. § 2510, et seq. would not apply to defendant. See, United States v. Peterson, 812 F.2d 486 (9th Cir. 1986)(wiretapping in Thailand and holding that the Wiretap Act "has no extraterritorial force"); Morrison v. Dietz, 2010 WL 395918 (N.D. Cal.)(because all interceptions occurred in Mexico, the Wiretap Act has no force).

22

1996).  Further, while not the central issue in Dahda v. United States, the Supreme Court noted in that case that "a listening post within the court's territorial jurisdiction could lawfully intercept communications made to or from telephones located within [the listening post state] or outside [the listening post state]."  Dahda v. United States, 584 U.S. 440, 450 (2018).

The "listening post" location of interception was within the DEA offices in the Central District of California, and it was there that agents gathered, recorded and acted on the messages.

**F.   The Use of CorCorp, Inc., While Innovative, Was Not A Violation of Defendant's Fourth Amendment Rights**

From a document filed separately from defendant's motion for wiretap suppression, defendant appears to wish to advance some type of technological argument, though the contours of it are not clear from the pleadings.  Defendant has filed a document entitled, "Notice of Joinder in Wiretap and Related Discovery Motion of Co-Defendant Zaid Wakil."  (CR 1116.)  What defendant joins is a reply document to a wiretap suppression motion filed by co-defendant Zaid Wakil in 2019.  (CR 977.)  Separately, in the wiretap motion that is the subject of this opposition, he makes the conclusory statements that the "DEA obtained EBDs and private server services with CorCorp designed to defeat the encryption software prior to any court authorization to do so," and "CorCorp had a contractual relationship with DEA while CorCorp was providing hosting servers for EBDs distributed to targets in this investigation."  (Def. Mot., pp. 27-28.)  What defendant is arguing is unclear.

Defendant is correct that CorCorp, Inc., was a private entity with contracts with the federal government.  Defendant seems to

suggest that there was something improper about CorCorp initially providing Blackberry devices such that messages could be decrypted after agents sent the devices to Mexico.  Defendant fails to explain what was improper about this process.  Notably, before the wiretap orders were obtained, SA Burkdoll retained one of the devices to communicate with Krokos, as undercover agents often do in undercover calls.  Case law has long recognized undercover calls and communications as a legitimate law enforcement tool.  Sorrells v. United States, 287 U.S. 435, 441 (1932)("Artifice and stratagem may be employed to catch those engaged in criminal enterprises.")  United States v. Carona, 660 F.3d 360, 366 (9th Cir. 2011)(use of false subpoena).  The subsequent providing of stored emails for the accounts, in April and May of 2010, was done pursuant to an 18 U.S.C. § 2703(d) email search warrant.  The Blackberry message wiretap communications obtained in "real time" were after the orders signed by the Court, the Honorable Judge Anderson.  Despite defendant's suggestion of some type of improper relationship between the DEA and CorCorp, Inc., defendant fails to explain how any of his Fourth Amendment rights were unlawfully invaded or violated.

Before the first of the wiretaps was authorized, the Court requested briefing from the government as to whether the Stored Communications Act might better address the providing of messages from the devices.  In the end, the Court authorized the wiretaps.  Defendant does not advance the argument that CorCorp, Inc., provided information to law enforcement outside of lawful court orders.

In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court adopted the "good faith" doctrine, which permits law enforcement officers to rely on the facial validity of search warrants.

24

Suppression of evidence is not an appropriate remedy when a search was based upon an apparently valid warrant that was later determined to be flawed so long as the executing officer had a reasonable basis for relying on the warrant's validity. Id. at 923. The good faith doctrine has been applied by the Ninth Circuit to wiretap cases. United States v. Reed, 575 F.3d 900, 917 (9th Cir. 2009) (suppression of wiretap "would not be warranted" where agents failed to seal call data content from the telephone company "because the Government acted in good faith"); see also United States v. Butz, 982 F.2d 1378, 1383 (9th Cir. 1993) (wiretap evidence should not be suppressed where officers relied in good faith on then-existing law in obtaining pen registers); United States v. Tham, 948 F.2d 1107, 1111 n.2 (9th Cir. 1991) (defendant incorrect that "the Leon good faith exception does not extend to wiretaps"), superseded on other grounds in United States v. Tham, 960 F.2d 1391 (9th Cir. 1991).

It is certainly correct that, in many areas of the law, statutes have not always kept pace with technological advances. In this case, however, agents were thorough in obtaining orders needed first, for search warrants, and later, for wiretap interceptions. As described above, wiretap applications require far more than a statement of probable cause. The government most comply with statutory necessity, prior interceptions, target subjects descriptions, periodic reports, and sealing of communications, among other requirements.

The agents were punctilious in observing defendant's Fourth Amendment rights, and whatever technological arguments defendant is advancing, agents were entitled to rely in good faith on the wiretap orders.

## IV.   CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendant's motion to suppress.