# EXHIBIT C

# Memorandum

| Subj:<br>Supervising Attorney's Instructions Regarding Monitoring Of Target Facilities | Date:<br><br>August 9, 2010 |
|---|---|
| To:<br><br>All Special Agents, Monitors, Specially Deputized Officers, Systems Administrators, or other personnel involved in this investigation | From:<br><br>LIZABETH A. RHODES<br>213-894-3541/213-393-5607<br>Assistant United States Attorney<br>Criminal Division<br>Supervising Attorney |

### 3. **Introduction**

This memorandum is designed to serve as a guide for all Monitors, Systems Administrators, Special Agents, officers and other individuals participating in the interception of wire and electronic communications in this investigation as authorized by the Order in Case No. CR Misc. 10–205(A)-PA ("the Order"). Detailed below is information relating to the legal requirements for intercepting wire communications and the procedures to be followed during this interception. Your objective is to execute the Order, intercepting only those communications that are specifically designated and minimizing the interception of non-pertinent or privileged communications. To that end, it is mandatory that you take the necessary time to carefully review and familiarize yourself with the contents of the following:

3.    This memorandum;

b.    The application and affidavit of Special Agent Rachel Burkdoll, seeking an order authorizing the interception of electronic communications; and

c.    The Court's Order Authorizing the Interception of electronic Communications.

All of these materials will be provided to you and should be maintained in the wire room for reference. The affidavit in particular will provide you with an understanding of the scope of this investigation and the subjects involved and will therefore assist you in minimizing non-pertinent communications. After you have read the materials, please sign the attached form indicating that you have done so, are familiar with their contents, and will conduct the interception in accordance with the requirements set forth in those materials. Please return that form to the Supervising Case Agent.

last updated: March 8, 2006                                      1

Alvarez PT Mot 000795

The name and telephone numbers of Special Agent Burkdoll, assigned to supervise this interception ("the Supervising Case Agent") and Lizabeth Rhodes, the Supervising Attorney will be provided.   If you have any questions at any time concerning the interception, do not hesitate to contact these persons.   It is much better to ask questions when issues arise, even if it means calling in the middle of the night, than not to ask the question.

## II. Target Facilities

The Order authorizes the initial interception of electronic communications (e-mails) to and from the following devices:

3.    The e-mail account address nomad@HaloSecure.ro, which is accessed using an EBD, with IMEI 3572 3803 5441 810, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by KROKOS, or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by KROKOS ("TARGET ACCOUNT #4");

b.    The e-mail account address hummer@HaloSecure.ro, which is accessed using an EBD, with IMEI 3572 3803 5179 808,   but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by ICHIRO, or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by ICHIRO ("TARGET ACCOUNT #5");

c.    The e-mail account address beast@HaloSecure.ro, which is accessed using an EBD, with IMEI 3572 3803 5440 192, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by ALVAREZ, or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by ALVAREZ ("TARGET ACCOUNT #6")[1];

d.    The e-mail account address blazing@HaloSecure.ro, which is accessed using an EBD, with IMEI 9800 4600 5336 612, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by KROKOS, or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by KROKOS ("TARGET ACCOUNT #8"); and

---

[1]    There is no Order authorizing interception of Target Account #7.

Alvarez PT Mot 000796

e.     The e-mail account address kinetic@HaloSecure.ro, which is accessed using an EBD, with IMEI 9800 4600 5336 893, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by KROKOS, or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by KROKOS ("TARGET ACCOUNT #9")(collectively referred to as the "TARGET ACCOUNTS.")

## III. Target Subjects

The DEA is conducting an investigation into the individuals listed in the order and others all of which are to be intercepted when discussing matters related to the Target Offenses (also listed in the order).

The Order authorizes the interception of electronic communications relating to the criminal activities of the Target Subjects, as well as any co-conspirators who are later identified.   You should be familiar with all known Target Subjects and their role(s) in the organization, as set forth more fully in the Affidavit.

## IV. Target Offenses

The Order authorizes interception of electronic (email)  communications which relate to the federal criminal offenses listed in the order.

As will be discussed below, the reason for the interception, and the focus of the interception, is the investigation of the Target Offenses, not other, unmentioned offenses.   Please be aware of the procedures, discussed at Section VIII, if electronic communications regarding other offenses are intercepted.

## V. Recording and Preserving the Interceptions

### 3.     Recording

Title 18, United States Code, Section 2518(8)(a) directs that "the contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device. The recording of the contents of any wire, oral, or electronic communication under this subsection shall be done in such a way as to protect the recording from editing or other alterations."

last updated: March 6, 2006                          3

Alvarez PT Mot 000797

This requirement is <u>mandatory</u> and simply means that all electronic communications must be recorded.  The law makes no distinction between "intercepting," "listening to," "overhearing," or "monitoring" a communication.  In this case, as DEA controls the server, all electronic communications will be intercepted and therefore must be recorded.

### b. <u>Preserving Recordings</u>

Section 2518 (8) directs not only that the recording must be preserved in such a way as to prevent editing or alteration, but also that "immediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. Custody of the recordings shall be where ever the judge orders.  They shall not be destroyed except upon an order of the issuing or denying judge and in any event shall be kept for ten years.  Duplicate recordings may be made for use or disclosure pursuant to the {relevant statutory} provisions...."

To ensure that the recording in this interception is preserved, the procedures set forth below should be followed, to the extent reasonably feasible:

3.    To secure the integrity of the monitoring process, the Systems Administrator will provide a log-in name and password to each Monitor, and will provide access to each Monitor for only those cases to which the Monitor is assigned.  The Monitors must log on to the computer system in order to monitor e-mails, and must log off whenever they leave their workstations for significant periods of time and at the conclusion of their shifts.  No other persons should be given access to the computer system.

2.  At the beginning of the interception period, three discs will be installed by a Systems Administrator.  One of the discs should be designated as an "evidence" copy, and will be the pertinent communications; a second should contain the "minimized or non-pertinent communications and the third will contain all communications should an issue arise.  The computer system is usually automatically set up to make a duplicate copy as the first is being recorded, or duplicate copies can be made later.  The duplicate copies are not sealed with the "evidence" copy, and can be used to create additional working copies.  These discs should be, to the extent feasible, physically and electronically labeled and formatted with information identifying them with the time period of interception, the date the disc is placed into and eventually removed from the disc library/ jukebox, and the Target Facilities intercepted.

last updated: March 6, 2006                                    4

Alvarez PT Mot 000798

3. No persons other than the Systems Administrators or those individuals and agents with access under their authority and/or supervision should have access to the disc, or even the server room, until such time as the disc is to be removed for sealing by the Court. The Systems Administrator and the Supervising Case Agent should ensure that the disc is never accessed improperly, altered or edited in any way throughout the course of the interception period.

4. At the end of the interception period, or when the disc becomes filled to capacity, whichever comes first, the disc should remain in the disc library/ jukebox until it is ready to be removed and placed in a sealed envelope or similar container. The disc should be kept in the custody of the Supervising Case Agent and/or the investigative agency until such time as it is presented to the Court for sealing. Prior to the removal of the disc, the System Administrator should take all reasonable care to ensure that all of the emails for that TARGET ACCOUNTS have moved from the computer repository and filters into the disc.

5. A chain-of-custody form should accompany the evidence disc. This form should indicate to whom, if anyone, the investigating agent transferred custody of the disc, and the date and time of transfer. Each subsequent transfer, including that to the Court, should be noted on the form. The form should also indicate the Target Accounts, the agency case number, and the dates of interception, in a fashion that matches the disc's electronic and physical designation.

6. Immediately upon the expiration of the interception period, the Supervising Case Agent should contact the Supervising Attorney with the date and time that interception ceased. The Supervising Attorney will then prepare the paperwork to have the disc sealed, and the evidence disc will be brought to the Court for sealing in accordance with the Court's instructions.

## VI. Monitoring: Logs and Line Sheets

The computer will also automatically generate some of the information to be included in the logs such as the date and time of the electronic communication, the duration of interception, whether the electronic communication was incoming or outgoing, and facility communicated with if outgoing. The computer also should automatically record the name of the monitoring agent/ monitor, as indicated by the log-on password. Finally, the computer should automatically indicate when interception of the communication was terminated for purposes of "minimization" (explained below) or other reasons. If any of these functions are not working properly, please inform the Supervising Case Agent or the Systems Administrator immediately.

Monitors, agents, and the Supervising Case Agent should take appropriate steps to keep others informed regarding identifications, communications, and the investigation in general, as well as any malfunctions and interruptions, information regarding interception of privileged communications, communications

last updated: March 6, 2006

5

Alvarez PT Mot 000799

regarding new crimes, or other pertinent data.    The Supervising Case Agent should discuss with the Monitors what procedures will be used to keep everyone informed.

The Supervising Case Agent should make sure that the Supervising Attorney is informed regarding the progress of the investigation, including the nature of intercepted communications, in such manner as the Supervising Attorney requests.

### VII: <u>Monitoring: Minimization</u>

Because the transmission of electronic messages occurs instantaneously, and because the messages sent are typically short (less than 200 characters) it is virtually impossible to attempt to minimize in the manner typically used with telephone communications as described above.   As such, the minimization (or non-interception) of non-pertinent electronic messages should be effected as follows:

A "dirty team" of Monitors should be developed.   The member(s) of this team must be Monitors who are unconnected with the instant investigation.   They cannot have previously monitored, or be used for future monitoring, and cannot be used in the investigation of the substantive crimes or otherwise participate in the Title III interceptions of the TARGET ACCOUNTS.   All text or electronic messages will be reviewed by the dirty team.   Based on the standards set forth in the preceding paragraphs (in terms of what may be intercepted and what may not be), the dirty team will then forward only the non-privileged passages to the Supervising Case agent.   The dirty team should not provide minimized information in any manner to any member of the instant investigation, including other Monitors, agents, or prosecutors.   All minimized messages (those not passed on to the Supervising Case agent) should be retained in a secure location for later review if necessary.

18 U.S.C. § 2517(5) states that if we inadvertently intercept communications "relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed" to other law enforcement officers and used as is appropriate within the scope of their duties.   Evidence derived from these interceptions may be used in prosecution only when subsequently authorized or approved by a court who finds that the communications were otherwise intercepted lawfully.

Accordingly, if you intercept communications regarding a crime <u>not</u> specified in the Order, you should intercept it the same way you intercept other calls, and <u>immediately</u> notify the Supervising Case Agent and the Supervising Attorney.   If you intercept communications regarding a crime to be committed, or a violent crime, it is especially important that you notify the Supervising Case Agent immediately.   A decision will be made as to whether or not future communications regarding the "other crime" will be monitored.   The Supervising Attorney will inform the court in the next interim report or application for interception about the inadvertent interception and the other crimes, and seek the appropriate authorization to use the information thereby obtained.

last updated: March 6, 2006                                6

Alvarez PT Mot 000800

## VIII: Monitoring: Privileges (for the Dirty Team)

18 U.S.C. § 2517(4) provides that "No otherwise privileged wire or oral communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character." A "privileged" communication is one that is intended to be confidential, and which occurs in a context (the specifics of the protected contexts are described below) such that the law allows the speakers to resist legal pressure to disclose its contents. As noted above, Section 2518(5) requires us to not intercept that which we could not obtain authorization to specifically intercept. While the privileges discussed below are generally evidentiary privileges (meaning that they are only assertable when disclosure is requested in a judicial proceeding), these two statutes together mean that if a communication would be "privileged," and not otherwise subject to disclosure by an exception, it cannot be intercepted at all. The speakers do not inadvertently waive their privilege by virtue of being intercepted. .

The basic categories of privileged communications are described below, followed by a section which explains when those privileges will not apply. Other than these categories, there are no privileges, or protected contexts, to be aware of. For example, no legal privilege exists with regard to communications between a Target Subject and his or her girlfriend/boyfriend, his or her children, or other relatives. Keep in mind, however, that our function is to intercept and record communications related to the Target Offenses, not indiscriminately to invade the privacy of our Target Subjects and others, so with these communications as with all others, follow the minimization rules above. If the communication is not pertinent, do not intercept it no matter who the speakers are.

### 3.    Attorney-Client Privilege

Confidential legal consultations between a person and his/her attorney are privileged and may not be intercepted. For an attorney/client privilege to apply to a communication, the following criteria must be met: (1) the communication must be made by the client for the purpose of seeking legal advice; (2) the advice must be sought from an attorney acting in a professional capacity; and (3) the communication must be made in confidence (with no third parties present on the electronic communication). The communication must be between attorney and client, meaning that if one person is having a communication with another person's attorney about that third person's case, that communication is not usually privileged. In other words, if Bob is on the phone with Joe's attorney discussing Joe's case, it is usually not privileged, and may usually be intercepted using the normal rules of minimization. However, the attorney-client relationship also has a Constitutional protection which must be respected and not interfered with or intruded upon, so calls that discuss trial strategy for any particular case may be privileged as well.

Accordingly, you must be aware any time an attorney is inadvertently identified as a party to a communication at all, and immediately notify the Supervising

Alvarez PT Mot 000801

Case Agent.   If you determine that a communication involving an attorney constitutes confidential legal consultation of any kind, notify the Supervising Case Agent, shut off the monitor and stop listening or recording.   Do not spot-check the call.   You will be notified if it has been decided by the Supervising Attorney that such communications are not protected by this privilege and may be intercepted in the future, but do not do so absent this notification.   If at any time during the investigation you learn the name of any attorney retained by any possible Target Subject or other involved party, that name and email addresses used are to be posted in a conspicuous place so that other Monitors will be aware and so that the privileged communications are not inadvertently intercepted in the future.   If you become aware that one of the Target Subjects has an ongoing criminal case, you should take care not to intercept discussions regarding a legitimate legal defense strategy, and should ensure that this information is not passed directly to the law enforcement officers or prosecutors involved in that case.   Instead, please notify the Supervising Case Agent and the Supervising Attorney so that the issue can be addressed.

### b. Husband-Wife Privilege

There is also a privilege covering communications between lawfully married spouses.   Note that this privilege does not apply unless the persons are lawfully married according to California state law.   California state law does not recognize common law marriages, or any long term relationship that has not been formalized by a marriage contract.   However, if a man and a woman have achieved a common law marriage while living in a state that does recognize such (and according to that state's rules), California will recognize that marriage.   This would be extremely difficult for you or law enforcement to know during the investigation, but if you become aware of any communications or evidence that indicate that intercepted persons may have a recognized marriage, please notify the Supervising Case Agent.

You are to discontinue monitoring if you discover that you are intercepting a personal, non-criminal communication solely between husband and wife.   Of course, you should not be intercepting any non-pertinent, non-criminal communications in any event, so application of this privilege should not change your ordinary minimization methods.

### c.   Parishioner-Clergyman Privilege

All confidential communications between a parishioner and his/her clergyman are to be considered privileged; this includes a person discussing his/her personal, financial or legal problems with his/her priest, minister, rabbi, etc..   Thus, if it is determined that a clergyman is a party to a communication being intercepted and that the communication is related to religiously inspired confessions, turn off the monitor, stop recording, and notify the Supervising Case Agent.

### d. Patient and Psychologist/Psychiatrist/Physician Privilege

Alvarez PT Mot 000802

All confidential communications between a patient and his/her psychologist, psychiatrist, licensed therapist, or licensed social worker relating to psychotherapy of the patient, or a doctor relative to diagnosis, symptoms, treatments, or any other aspect of physical, mental, or emotional health are to be considered privileged.   If it is determined that a patient and his/her psychologist, psychiatrist or physician are parties to a communication being intercepted and the communication relates to treatment of the patient, turn off the monitor, stop recording, and notify the Supervising Case Agent.

### e. Exceptions to Privileges

There are certain exceptions to the privileges.   In any event, even if you think the below exceptions apply, notify the Supervising Case Agent if a call that may be protected by the privileges is inadvertently intercepted.   Do not attempt to make this determination on your own.   Moreover, if a truly privileged communication is inadvertently recorded, that information should be made known to the Supervising Case Agent and the Supervising Attorney immediately so that appropriate procedures may be put in place.   Even if one of the exceptions below applies, you must still minimize the communication as you would any other call.

The exceptions are:

3.      "Third Parties":  If you are able to determine from the interception of the communication that third parties are present on the email communication, you may continue to intercept the communication using the normal rules of minimization. In a case where an attorney and client or doctor and patient are on the electronic communication, the third party must not be employed by the attorney or doctor in any way.

2.   "Joint Participants": If the investigation has already revealed that the parties, who normally would enjoy a privileged relationship, are presently criminally involved with the Target Subjects, and are discussing on-going, as opposed to past, criminal activity you may continue to intercept the communication using the normal rules of minimization.

### X: Security / Disclosure of Intercepted Communications

last updated: March 8, 2006                                        9

Alvarez PT Mot 000803

It is vitally important that security be maintained at the location where the interception is being monitored to ensure the integrity of the recorded communications. Only authorized federal agents, specially-designated local law enforcement officers, other individuals under contract with the government, and the Supervising Attorney or an attorney designated by the Supervising Attorney will be allowed in the monitoring post while the interception is in progress. Friends, relatives, and curious agents and officers not involved in the interception are to be kept out of the wire room. There will be no exceptions to this rule. Moreover, Monitors, Special Agents, and Systems Administrators should be careful not to discuss the fact that they are working on a wiretap outside of the wire room with anyone, in order to avoid inadvertent disclosure.

Before anyone, including the Supervising Case Agent, discloses the content of any intercepted communications to other individuals including law enforcement, consult with the Supervising Attorney. Intercepted communications cannot be disclosed to everyone. Investigative agents who participate in the interception of, or who have learned of, intercepted communications from a person entitled to tell them may disclose and use that information in the performance of their official duties. This is not an unlimited authorization to disclose such information, but is confined to disclosures appropriate to the proper performance of the official duties of the agent, officer or other individual making or receiving the disclosure.

Alvarez PT Mot 000804

STATE OF MONITORING AGENTS

I declare that I have read the following documents and am familiar with their contents:

1.  The Supervising Attorney's Instructions Regarding Monitoring of Target Telephone/s.

2.  The Application and Affidavit in Support of the Application For an Order Autorizing the Interception of Wire Communications; and

3.  The Order Authorizing the Interception of Wire Communications.

I further declare that I will conduct interception in accordance with the requirements set forth in the above documents.

| DATE | NAME    (Printed) | SIGNATURE | AGENCY |
|---|---|---|---|
| 8/6/10 | Solange Jatin | | metro |
| 8/6/10 | Gino Carranza | | METRO |
| 8/6/10 | Jime Taylor | | Metro |
| 8/6/10 | Sergio Oneke | | METRO |
| 8/6/10 | Shirley Tabora | | METRO |
| 8/6/10 | Rachel Burkdoll | | DEA |

Alvarez PT Mot 000805

| 8/7/10 | Alma Gansborough | | METRO |
| 8/8/10 | Alex Mary | | METRO |
| 8/8/10 | Rose Menchaca | | Metro |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Alvarez PT Mot 000806

## STATEMENT OF MONITORING AGENTS

I declare that I have read the following documents and am familiar with their contents:

3. The Supervising Attorney's Instructions Regarding Monitoring Of Target Accounts in CR 10-205(a)-PA;

2. The Application and Affidavit in Support of the Application For an Order Authorizing the Interception of Electronic Communications in CR 10-205(A)-PA; and

3. The Order Authorizing the Interception of Electronic Communications in CR 10-205(A)-PA.

I further declare that I will conduct interception in accordance with the requirements set forth in the above documents.

| DATE | Name (Printed) | Signature | Agency |
|------|----------------|-----------|--------|
| 8/10/10 | Alex Alday | | METRO |
| 8/10/10 | Rachel Burkdoll | | DEA |
| 8/10/10 | Solange Valin | | Metro |
| 8/10/10 | Sergio Ornelas | | METRO |
| 8/10/10 | Mike Taylor | | METRO |
| 8/10/10 | Gino Carranza | | METRO. |
| 8/11/10 | Luis Lanazca | | METRO |
| 8/11/10 | Mike Quinn | | DEA |
| | | | |
| | | | |
| | | | |
| | | | |

last updated: March 6, 2006                    1

Alvarez PT Mot 000807

# Memorandum

| Subj:<br>Supervising Attorney's Instructions Regarding Monitoring Of Target Facilities | Date:<br><br>August 16, 2010 |
|---|---|
| To:<br><br>All Special Agents, Monitors, Specially Deputized Officers, Systems Administrators, or other personnel involved in this investigation | From:<br><br>LIZABETH A. RHODES<br>213-894-3541/213-393-5607<br>Assistant United States Attorney<br>Criminal Division<br>Supervising Attorney |

## I. Introduction

This memorandum is designed to serve as a guide for all Monitors, Systems Administrators, Special Agents, officers and other individuals participating in the interception of wire and electronic communications in this investigation as authorized by the Order in Case No. CR Misc. 10–205(B)-PA ("the Order"). Detailed below is information relating to the legal requirements for intercepting wire communications and the procedures to be followed during this interception. Your objective is to execute the Order, intercepting only those communications that are specifically designated and minimizing the interception of non-pertinent or privileged communications. To that end, it is mandatory that you take the necessary time to carefully review and familiarize yourself with the contents of the following:

    a.    This memorandum;

    b.    The application and affidavit of Special Agent Rachel Burkdoll, seeking an order authorizing the continued interception of electronic communications; and

    c.    The Court's Order Authorizing the Interception of electronic Communications.

All of these materials will be provided to you and should be maintained in the wire room for reference. The affidavit in particular will provide you with an understanding of the scope of this investigation and the subjects involved and will therefore assist you in minimizing non-pertinent communications. After you have read the materials, please sign the attached form indicating that you have done so, are familiar with their contents, and will conduct the interception in accordance with the requirements set forth in those materials. Please return that form to the Supervising Case Agent.

last updated: March 6, 2006         1

Alvarez PT Mot 000808

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
LIZABETH A. RHODES
Assistant United States Attorney
California Bar Numbers:  155299
     14th Floor United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-3541
     Facsimile:  (213) 894-0142
     E-Mail:    lizabeth.rhodes@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

IN THE MATTER OF THE            )    CR Misc. No.  10-205-PA
APPLICATION OF THE UNITED       )
STATES OF AMERICA FOR AN        )
ORDER AUTHORIZING (1) THE       )    FIFTEEN DAY REPORT
INTERCEPTION OF ELECTRONIC      )
COMMUNICATIONS; (2) THE         )
INSTALLATION AND USE OF A       )    (UNDER SEAL PURSUANT TO
PEN REGISTER AND A TRAP AND )        18 U.S.C. § 2518(8))
TRACE DEVICE AND (3) THE        )
ACQUISITION OF PRECISE          )
LOCATION INFORMATION FROM       )
GLOBAL POSITIONING SYSTEM       )
_____)

I.    The Court's Order

      On July 13, 2010, the Honorable Percy Anderson, United States District Court Judge, signed Court Order 10-205-PA authorizing and approving an order for the initial interception of electronic communications for the below listed Target Accounts.  On July 14, 2010, interception began on Target Accounts #1 and #2.  An amended order for Target Account #3 was filed on July 19, 2010, and interception began on July 20, 2010.

Interception of all three Target Accounts is active, although as stated herein, activity has significantly decreased.  The Target Accounts are as follows:

        a)     The email account address pyro@HaloSecure.ro (which has since changed the address, but not the IMEI to immortal@HaloSecure.ro), which is accessed using an EBD, with IMEI 9800 4600 533 3746, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, currently used by an unknown associate of KROKOS', or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by KROKOS ("TARGET ACCOUNT #1");

        b)     The e-mail account address civic@HaloSecure.ro, which is accessed using an EBD, with IMEI 9800 4600 533 4963, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by ICHIRO, or any changed e-mail address accessed through the above-referenced IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by ICHIRO ("TARGET ACCOUNT #2"); and

        c)     The e-mail account address ford@HaloSecure.ro, which is accessed using an EBD, with IMEI 9800 4600 531 7299, but no subscriber information, and service provided by CorCorp, Inc., located in Herndon, Virginia, believed to be used by ALVAREZ, or any changed e-mail address accessed through the above-referenced

IMEI number or any IMEI number accessed through the above-referenced e-mail address, believed to be used by ALVAREZ ("TARGET ACCOUNT #3") (collectively referred to as the "TARGET ACCOUNTS.")

The Court found that there was probble cause to conclude that the Drug Enforcement Administration ("DEA") is conducting an investigation into possible violations of offenses enumerated in 18 U.S.C. § 2516, to include:

a. Conspiracy to Possess With Intent to Distribute, and Distribution of Controlled Substances, in violation of Title 21 U.S.C. §§ 846 and 841; and Possession with Intent to Distribute, in violation of Title 21 U.S.C. § 841(a)(1);

b. Use of Communication Devices to Facilitate Drug Offenses, in violation of Title 21 U.S.C. § 843(b);

c. Money Laundering, in violation of Title 18 U.S.C. §§ 1956 and 1957;

d. Interstate and Foreign Travel or Transportation to Distribute Proceeds of Unlawful Activity or Carry on any Unlawful Activity, in violation of Title 18 U.S.C. § 1952;

e. Importation of Controlled Substances into the United States, in violation of Title 21 U.S.C. § 952(a)

f. Attempt and Conspiracy to Import Controlled Substances into the United States, in violation of Title 21 U.S.C. § 963;

g. Possession, manufacture or distribution of controlled substance in violation of Title 21 U.S.C. §§ 959-960;

and

h.    Conspiracy, in violation of Title 18, United States Code, Section 371 (hereinafter referred to as the "Target Offenses")[1] by John Darrell Krokos, also known as ("aka") "Hulk," aka "yoyo hulk," aka "JJ," aka "Walter," aka "Lord of the Beaches," aka "Pilot," aka "Ape," aka "Captain" ("KROKOS"); Jesus Esteban Felix-Leon, aka "Tokotiyo," aka "Toko," aka "Maestro," aka "Metro," aka "Marquitos," aka "M," aka "Professor," aka "Captain" ("FELIX"); Ismael Ichiro-Tomatani, aka "H," aka "Gilligan," aka "Harry" ("ICHIRO"); Jesus Felix-Alvarez, aka "Lil M," aka "Mr Howell," aka "Coach" ("ALVAREZ")[2]; FNU LNU, aka "The Mechanic," aka "Pawnstar," aka "Dirtytricks," aka "porkchop," ("THE MECHANIC"); Roger Teigrob aka "pol" ("TEIGROB"); Larry Amero ("AMERO"); FNU LNU, aka "Chin" ("CHIN"), FNU LNU, aka "Tito" ("TITO"); FNU LNU, aka "Hammer" ("HAMMER"); FNU LNU aka "Smooth" ("SMOOTH"); Silveria Corazon-Redato ("CORAZON"); FNU LNU aka "Tata" ("TATA"); FNU LNU aka "HOLDEM" aka "Power," aka "Powertrain" ("HOLDEM"); FNU LNU aka "Chavo" (CHAVO); and others yet unknown (hereinafter the "Target Subjects"), and further that there was probable cause to believe that the Target Accounts were

---

[2]    A confidential source cooperating with law enforcement (discussed herein) provided information that Jesus FELIX-Leon had a son by the name of "Jesus" and that the son's mother was Delia Alvarez.  Based on SA Burkdoll's experience, she has learned that persons born in Mexico are given the last names of both of their parents:  the father's first part of his last name is followed by the first part of the mother's last name.

being used to further the Target Offenses and there is a need for interception of the Target Accounts.

II.    Status

The Order in CR Misc. No 10-205-PA authorized the initial electronic interception of Target Accounts #1, #2, and #3. Interception on Target Accounts #1 and #2 began on July 14, 2010, and an amended order for Target Account #3 was filed on July 19, 2010, and interception began on July 20, 2010. During the late afternoon to early evening of July 21, 2010, the frequency of communications intercepted over Target Accounts #1 through #3 dropped noticeably.

From July 14, 2010 through July 28, 2010, agents have intercepted approximately 3,565 electronic messages, of which 2,371 (or 94%) are pertinent. There are also messages that are being intercepted which are still encrypted. These are messages that are intercepted from other EBD companies; however, when the encrypted message becomes part of a larger message string, agents received the decrypted message. Because the nature of the encrypted message cannot currently be determined, these messages are listed as "undecided."

Since the beginning of the initial interception period, the following activities have occurred regarding the Target Accounts:

1)    On July 21, 2010, SA Burkdoll received a communication from KROKOS that he would be switching from Target Account #1 to another HaloSecure EBD that he had previously purchased, which is

nomad@HaloSecure.ro.  Several additional communications from KROKOS were intercepted on Target Account #1 up until July 27, 2010.

2)    Later on July 21, 2010, agents intercepted a communication that ICHIRO was switching from Target Account #2 to hummer@HaloSecure.ro and that ALVAREZ was switching from Target Account #3 to beast@HaloSecure.ro.

3)    After July 21, 2010, SA Burkdoll began observing e-mails from hawk@HaloSecure.ro, which was being used by KROKOS at the time.

4)    On July 27, 2010, KROKOS sent an e-mail to ICHIRO on Target Account #2 advising him that he would now be using blazing@HaloSecure.ro.

5)    Furthermore, intercepted messages revealed that KROKOS was going to travel to Canada on July 30, 2010 for a month and that he would obtain a new EBD there.

6)    On July 27, 2010, KROKOS had the following accounts erased and new e-mail addresses assigned to them: pyro@HaloSecure.ro was changed to immortal@HaloSecure.ro (Target Account #1,) slice@HaloSecure.ro was changed to empire@HaloSecure.ro, and hawk@HaloSecure.ro was changed to kinetic@HaloSecure.ro.

7)    On July 27, 2010, intercepted e-mail messages on Target Account #1 revealed that KROKOS was no longer the user of that account.  An e-mail message was intercepted from Target Account #1 to blazing@HaloSecure.ro which stated, "Hello blazing. How are

you thank you for bb (EBD)". Based on additional intercepted messages, it appeared that English was not the first language of the user of Target Account #1. Based on these intercepted messages, the user appeared to be an associate of KROKOS', but his/her identity is currently unknown.

During this 15-day period, (July 14, 2010 to July 27, 2010), agents learned that KROKOS brought a new group of customers to buy cocaine from FELIX through ALVAREZ and ICHIRO. KROKOS would inform ALVAREZ of the number of kilograms of cocaine that he had received orders for, and then ALVAREZ would advise how long it would take before the delivery could occur. With KROKOS' "new" customers, half of the money was required up front before ICHIRO would deliver any cocaine. KROKOS quoted $22,200 for each kilogram to his "new" customers. KROKOS would receive a coded telephone number from the "new" customers, which he would then provide to ICHIRO. ICHIRO would also obtain a disposable cellular phone in which to call the coded number. ICHIRO would make arrangements of where and when to meet the money and cocaine couriers on the disposable phone, and then meet with them to either obtain the money or deliver to them the cocaine. The narcotics courier would then take the cocaine to the "tp" (transport) for transportation to Canada. I believe that the cocaine is being smuggled in semi-trucks to Canada amongst legitimate loads. After a few days, KROKOS would receive confirmation when the cocaine arrived in Canada.

Case 2:12-cr-00527-GW    Document 1118-3    Filed 05/16/25    Page 23 of 31   Page ID
#:12264
Case 2:10-cm-00205-UA    Document 16    Filed 08/05/10    Page 8 of 16   Page ID #:280

KROKOS was very familiar with the "new" customers and was able to have a kilogram of cocaine "thrown on" a larger load. KROKOS discussed selling each kilogram for $39,000 to $40,000 in Canada.  KROKOS had to pay for the delivery of the kilogram, but this was still perceived as a favor, as KROKOS did not have to acquire his own transportation to smuggle the cocaine to Canada. Furthermore, he would likely have difficulty finding someone to smuggle one kilogram of cocaine into Canada.

KROKOS also received messages that the "tp" for the "old" customers was on vacation, and would not be back for a week.  His "old" customers also informed KROKOS that they were currently in possession of 150 kilograms of cocaine and that they needed to sell them before they could purchase any more.

In addition, agents have effectively mobilized surveillance units to observe transactions between Target Subjects, and fully identify the individuals involved.  Agents are now familiar with some of the code language used on the Target Devices as well as codes used to send cellular phone numbers.

Furthermore, KROKOS has also requested additional BlackBerry devices.

III. Examples of Intercepted Messages

Below are several messages intercepted during this 15-day period.

1.    On July 14, 2010, the following message string occurred between KROKOS, using Target Account #1, and HOLDEM:

------Original Message------
From: Power [HOLDEM]
To: pyro [KROKOS/Target Account #1]
Subject:
Sent: Jul 14, 2010 6:42 PM[3]
Do u have 19 goodones [sic] right now pal will grab if so

------Original Message------
From: Pryros [KROKOS/Target Account #1]
To: Powertrain [HOLDEM]
Subject: Re:
Sent: Jul 15, 2010 1:14 AM
U bet bro

------Original Message------
From: Power [HOLDEM]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 14, 2010 8:17 PM
What r the best stamps again (symbol pressed into a kilogram of cocaine which can indicate quality)

------Original Message------
From: Pryros [KROKOS/Target Account #1]
To: Powertrain [HOLDEM]
Subject: Re:
Sent: Jul 15, 2010 1:20 AM
Boss, nike swoosh,HK,H1, 100A

------Original Message------
From: Power [HOLDEM]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 14, 2010 8:55 PM
Ok grab wc (19)[4] of the best one(s) and we will take tommorow. [sic] Pap (paper, code for money) is ready

---

[3] The timestamp on the e-mail messages changes depending on what the user of the EBD has the time set to as well as communications that occur across different time zones. Additionally, the names in the "to" and "from" sections differ depending on how the participants saved each other's information in their contacts folder on the EBDs. Thus, in this message string it appears that KROKOS has identified HOLDEM as "Power". Similarly HOLDEM identifies KROKOS as "Pyros".

[4] Through this investigation, I have observed telephone numbers passed using at least two codes: (1) the "MASON WHITE" replacement code which was explained in the 7/13/10 Affidavit ¶ 116; and (2) a code that uses the letters that share the same numbers on the EBDs with the following significance --- W=1, E=2, R=3, S=4, D=5, F=6, Z=7, X=8, C=9, and O or 0=0. So when HOLDEM stated, "Ok grab wc" I know that this is code for 19 kilograms of cocaine.

```
------Original Message------
From: Pyros [KROKOS]
To: Powertrain [HOLDEM]
Subject: Re:
Sent: Jul 15, 2010 2:00 AM
Ok ill get it organized
```

2.    Shortly thereafter, KROKOS, using Target Account #1, participated in the following message string with ALVAREZ, using Target Account #3:

```
------Original Message------
From: Captin [KROKOS/Target Account #1]
To: ford [ALVAREZ/Target Account #3]
Subject:
Sent: Jul 14, 2010 7:00 PM
Bro I can take 19 in the morning
```

```
------Original Message------
From: Lil M [ALVAREZ/Target Account #3]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 14, 2010 9:02 PM
Ok koo. (cool) Could. Could we receave [sic] paper (money)
today so we could have time for tmrw (tomorrow)
```

```
------Original Message------
From: Captin [KROKOS/Target Account #1]
To: ford [ALVAREZ/Target Account #3]
Subject: Re:
Sent: Jul 15, 2010 2:03 AM
I don't know bro its diff (different) people so they want to
do same time exchange.. Ill [sic] ask them
```

3.    Following this conversation, there were multiple messages going back and forth about how to conduct the cocaine transaction.  Ultimately, KROKOS, using Target Account #1 sent the following message to ALVAREZ on Target Account #3:

```
------Original Message------
From: Captin [KROKOS/Target Account #1]
To: ford [ALVAREZ/Target Account #3]
Subject:
Sent: Jul 14, 2010 7:22 PM
They will drop like 200k ($200,000) first thing in morning..
```

```
------Original Message------
From: Lil M [ALVAREZ/Target Account #3]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 14, 2010 9:30 PM
Ok koo (cool) bro. We have em (them) ready
```

4.   The $200,000 referenced in the above conversation, was to pay for the first half of the cocaine transaction.  SA Burkdoll believes that HOLDEM was doing this to build trust with ALVAREZ and ICHIRO.  ICHIRO would then deliver the 19 kilograms of cocaine, and would be paid the remaining amount afterwards.

5.   On July 15, 2010, KROKOS, using Target Account #1 participated in the following message string with ICHIRO, using Target Account #2:

```
------Original Message------
From: pyro [KROKOS/Target Account #1]
To: civic [ICHIRO/Target Account #2]
Subject:
Sent: Jul 15, 2010 9:08 AM
So all the nikes and boss and HKs bro and whatever else that
looks good please bro I got away with u not having to check
them but the (they) requesting those stamps ok bro for this
19 maybe 20..

------Original Message------
From: H [ICHIRO/Target Account #2]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 15, 2010 11:10 AM
Ok. But everything else looks nice though. There's also the
2010 star.
```

6.   This message string was the first conversation where the amount had risen from 19 to 20 kilograms of cocaine.  Later KROKOS, using Target Account #1, told HOLDEM, "So its ok to throw one (add one kilogram of cocaine for KROKOS onto the transport for the 19 kilograms) on p said.. Tell your guys thank you bro".

Case 2:10-cm-00205-UA    Document 16    Filed 08/05/10   Page 12 of 16   Page ID #:284

7.   Shortly thereafter, KROKOS and ICHIRO, using Target Accounts #1 and #2 respectively participated in the following message string:

```
------Original Message------
From: H [ICHIRO/Target Account #2]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 15, 2010 1:22 PM
Ok. Who's calling again?

------Original Message------
From: pyro [KROKOS/Target Account #1]
To: civic [ICHIRO/Target Account #2]
Subject:
Sent: Jul 15, 2010 11:23 AM
A girl she will say its jeff

------Original Message------
From: H [ICHIRO/Target Account #2]
To: pyro [KROKOS/Target Account #1]
Subject: Re:
Sent: Jul 15, 2010 1:23 PM
Ok.

------Original Message------
From: pyro [KROKOS/Target Account #1]
To: civic [ICHIRO/Target Account #2]
Subject:
Sent: Jul 15, 2010 11:28 AM
U started the code at 1 correct?Tot+aai-eiti
```

8.   This message string revealed several pieces of information regarding the DTO. As is typical with larger narcotics trafficking organizations, couriers are normally not told true names for each other. For HOLDEM's money courier, even though KROKOS was told that it was a female, she was instructed to give the name "Jeff" when she contacted ICHIRO. "Tot+aai-eiti" is a phone number which used the replacement code "MASON WHITE." When translated, the cellular phone number is (949) 228-0898.

9.   California Bureau of Narcotic Enforcement (BNE) surveillance units were deployed to cover this meeting and attempted to identify who the female was that ICHIRO was going to pick up $200,000 from.

a.   At 11:26 a.m.[5], SA Pavlich saw a grey Chevrolet Tahoe with California plate 5VHN077 (registered to Antonio Akira Tomatani at the same address as ICHIRO's residence) ("the Tahoe") exit the driveway at ICHIRO's residence, 1423 Vanderwell Avenue, LaPuente, California.   Surveillance units followed ICHIRO who drove in an indirect route to the Burlington Coat Factory, 2753 East Eastland Center Drive, West Covina, California.

b.   TFO Devlin saw ICHIRO inside of the store looking at luggage.

c.   Shortly thereafter, SA Spillman saw ICHIRO leave the store carrying two red duffel bags.

d.   After leaving the parking lot of Burlington Coat Factory, surveillance units saw ICHIRO driving through residential neighborhoods and believed that he was conducting counter-surveillance.

e.   SA Burkdoll began requesting GPS coordinates for Target Account #2, which placed ICHIRO in a nearby mall.   BNE surveillance units relocated to the vicinity where the GPS coordinates placed ICHIRO but were unable to locate him.

10.   Surveillance was terminated when ICHIRO, using Target Account #2, sent KROKOS, on Target Account #1, the following, "Ok

---

[5]   All times are approximate.

bro.. Got the check. ($200,000) Now I'm ready to drop that off. (20 kgs of cocaine) R they ready?" KROKOS replied with, "No they [sic] taxi (person/courier receiving the cocaine from ICHIRO) will be ready at about 5pm is that ok bro.."

11. Later that day, KROKOS, on Target Account #1, was forwarded the below message string which occurred between HOLDEM and one of his workers with the moniker "BBrotherman."

```
------Original Message------
From: BBrotherman
To: Powertrain [HOLDEM]
Subject:
Sent: Jul 16, 2010 1:26 AM
Call same guy from this morning give the rest of files? This
morning my girl give e00k (200K) already so what's the
balance?

------Original Message------
From: Power [HOLDEM]
To: pyro [KROKOS/Target Account #1]
Subject: Fw:
Sent: Jul 15, 2010 8:29 PM

------Original Message------
From: pyro [KROKOS/Target Account #1]
To: powertrain [HOLEDM]
Subject: Re:
Sent: Jul 16, 2010 1:33 AM
221,800 remainder..
19x22200 421,800 (19 kgs of cocaine at $22,200 each equals
$421,800)
         -200,000 (minus $200,000 that UF delivered to
ICHIRO)
         221,800 (total amount still owed)
```

12. In the first part of the message string, SA Burkdoll believes that BBrotherman was asking if his courier should call ICHIRO again in order to make arrangements for picking up the cocaine. Additionally, when BBrotherman stated that "e00k" had been delivered that morning to ICHIRO, SA Burkdoll believes,

14

based on the new replacement code, that "E" equals "2." This was also confirmed by KROKOS' disregard for the coded communication when he sent the message which subtracted "200,000" from the total cost of the cocaine. KROKOS later sent a message from Target Account #1 to HOLDEM and said, "Jeff called meeting at 8pm." Based on the communications up until this point, SA Burkdoll believes that "Jeff" was the nickname for the male who was to pick up the 16 kilograms of cocaine from ICHIRO at 8:00 p.m. on July 16, 2010.

## IV. Minimization

All intercepting Agents and Monitors have been instructed regarding the manner in which to conduct minimization in order to avoid intercepting conversation that are not authorized by the Court Order.

//

//

//

//

//

//

//

//

//

//

15

V.    Conclusion

The government further requests that this report be sealed pursuant to Title 18, United States Code, Section 2518(8)(b) pending further order of the Court.

VI.    Approval By the Court

The Court has read and reviewed the above report. This report and the Court order shall remain sealed.

DATE: August 2, 2010

_____
THE HONORABLE PERCY ANDERSON
UNITED STATES DISTRICT JUDGE

Presented by:

_____
Lizabeth Rhodes
Assistant United States Attorney
Senior Litigation Counsel

16