# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**

| Case No. | CR 12-527-GW | Date | July 1, 2025 |
|---|---|---|---|

Present: The Honorable   **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

Interpreter   NONE

| Javier Gonzalez | None Present | Timothy J. Searight - not present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| 3. Jesus Felix-Alvarez | not | ✔ | | Richard W. Raynor | not | ✔ | |

**PROCEEDINGS:**   **IN CHAMBERS - TENTATIVE RULINGS ON DEFENDANT'S MOTION TO DISMISS COUNT TWO OF THE INDICTMENT BECAUSE EXTRADITION ON THAT CHARGE WAS OBTAINED THROUGH THE PRESENTATION OF FALSE AND FRAUDULENT EVIDENCE [1114]; and DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE, TO SUPPRESS EVIDENCE PURSUANT TO WARRANTS, REQUEST FOR FRANKS HEARING [1115]**

Attached hereto is the Court's Tentative Rulings on Defendant's Motions [1114, 1115], set for hearing on July 3, 2025 at 8:00 a.m.

| | : | |
|---|---|---|
| Initials of Deputy Clerk | JG | |

<u>*United States v. Felix*</u>, Case No. 2:12-cr-00527-GW-3
Tentative Rulings on: (1) Motion to Dismiss Count Two of the Indictment Because
Extradition on That Charge Was Obtained Through the Presentation of False and
Fraudulent Evidence, and (2) Motion to Suppress Wiretap Evidence, to Suppress
Evidence Pursuant to Warrants, Request for *Franks* Hearing

Jesus Esteban Felix, Jr. ("Defendant")[1] has filed two motions set for hearing this day: a motion to dismiss count two of the Indictment issued May 31, 2012, and a motion to suppress/for a *Franks* hearing.

A. Motion to Dismiss

After Defendant explains why he believes that information in each of three declarations attached to the Government's request for extradition of Defendant from Mexico contained materially false statements,[2] and asserts that he is not properly-charged with a violation of 21 U.S.C. § 848, it eventually becomes clear that Defendant's motion to dismiss count two of the Indictment is based primarily on the "doctrine of specialty." Docket No. 1114, at 7:25-10:10. As part of that challenge, Defendant also asserts that Mexico was not properly-informed of certain sentencing impacts facing him because of the Section 848 charge. *See id.* at 9:24-10:10. Beyond that, Defendant also argues that the "doctrine of dual criminality" prohibited his extradition here because Section 848 "has no analogy under Mexican law" because of differences in possible sentences upon conviction. *Id.* at 10:12-23. Finally, in a single reasoned sentence, without citation to any authority, Defendant contends that the allegedly "false statements" he led his motion with mean that "the government has undermined the integrity of the extradition process," denying him "a fair hearing and due process." *Id.* at 11:2-5.

1. Doctrine of Specialty

"Because the surrender of the defendant requires the cooperation of the surrendering state, preservation of the institution of extradition requires that the

---

[1] In the Indictment, Defendant is referred to as "Jesus Felix-Alvarez."

[2] In his Reply brief, Defendant adds multiple *omission-based* purported falsehoods. *See* Docket No. 1119, at 5:1-7:7 (pagination references for Defendant's briefs, throughout this document, are to the pagination provided by the Court's CM/ECF system, as Defendant's briefing lacks pagination.). Obviously, such a tactic did not provide the Government an opportunity to respond.

petitioning state live up to whatever promises it made in order to obtain extradition." *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986).  Thus, the doctrine of specialty, as incorporated into the extradition treaty between the United States and Mexico, "precludes the requesting country from prosecuting a defendant for any offense other than that for which the surrendering country consented to extradite," absent exceptions not relevant here.  *United States v. Soto-Barraza*, 947 F.3d 1111, 1116 (9th Cir. 2020); *see also Van Cauwenberghe v. Biard*, 486 U.S. 517, 523 (1988); *United States v. Rauscher*, 119 U.S. 407, 430 (1886); *United States v. Andonian*, 29 F.3d 1432, 1437 n.2 (9th Cir. 1994) ("*Rauscher* protects an extradited defendant only from being tried on a wholly different offense than that for which extradition is granted."); *Caplan v. Vokes*, 649 F.2d 1336, 1343 (9th Cir. 1981) ("[T]he 'principle of specialty' limits prosecution in the requesting country to those extraditable offenses established by the facts on which extradition has been granted by the asylum country.").

Here, Defendant does not appear to claim that he is about to be prosecuted for "any offense other than that for which [Mexico] consented to extradite" him.  Instead, he focuses on what he asserts were falsehoods existing at several points in the extradition papers the Government submitted to Mexico.

Quoting from *Andonian* (though without a pin-cite), Defendant asserts that "'[t]he doctrine of specialty has been interpreted as requiring that 'the prosecution be based on the same facts as those set forth in the request for extradition.'"  Docket No. 1114, at 8:17-21.  *Andonian* does indeed make that statement (citing only a D.C. Circuit decision, *United States v. Sensi*, 879 F.2d 888, 895-96 (D.C. Cir. 1989), as support).  However, it did not reach a *holding* based on that proposition.

The *Andonian* decision considered, in part, an argument that the doctrine of specialty was violated because, the defendant argued, "he was not tried on the same facts as those presented to the government of Uruguay" due to his belief "that the United States convinced Uruguay with insufficient and false evidence" and he was then "tried . . . on different evidence."  29 F.3d at 1437-38.[3]  Resolving that argument, in part, the

---

[3] Of course, here, Defendant has not yet been *tried* on any evidence, unlike the defendant in *Andonian*.  If, indeed, Defendant is correct in his prediction that the Government will use evidence at trial that conflicts with evidence it provided to Mexico, Defendant has preserved his "doctrine of specialty" argument here.

Ninth Circuit stated that "[t]he government is not required, under the auspices of specialty, to try a defendant on the same *evidence* that was presented to the surrendering state, so long as it satisfies the requirement that trial is for the same offenses arising out of the same allegations of fact." *Id.* at 1438.[4] *But see United States v. Khan*, 993 F.2d 1368, 1374 (9th Cir. 1993) (comparing language in United States extradition treaties with Great Britain and Pakistan, and concluding "[w]e are not convinced that the doctrine of specialty is satisfied under *all treaties* as long as the prosecution is based on the same facts as those set forth in the request for extradition.") (emphasis added).  Here, again, there is no suggestion that the Government is attempting to prosecute Defendant for something other than "the same offenses."[5]

The Ninth Circuit also rejected the defendant's assertion in *Andonian* "that the evidence presented to Uruguay was false."  *Andonian*, 29 F.3d at 1438.  However, nowhere did it indicate that, even if the defendant's characterization of the evidence in that fashion was accurate, it would have created a fatal "doctrine of specialty" problem.  *See id.*  The *rejection* of the argument does not serve as support for the position that this type of argument is a valid one under the doctrine of specialty.[6]

---

Beyond that, if there are fatal flaws in the Government's case against Defendant under Section 848, presumably he will be acquitted.

[4] *Andonian* also established – for cases involving, unlike here, superseding indictments that are asserted to be in violation of the doctrine of specialty because they present more counts (of the same substantive offense) and more wide-ranging allegations – that "the appropriate test" was "'whether the extraditing country would consider the acts for which the defendant was prosecuted as independent from those for which he was extradited.'"  29 F.3d at 1434-35, 1437 (quoting *United States v. Cuevas*, 847 F.2d 1417, 1428 (9th Cir. 1988)).  *Andonian* also approved of that same approach taken in a case that, like here, did *not* involve a superseding indictment.  *See id.* at 1435-36 (discussing *Cuevas*).

[5] As the Government explains in its Opposition brief:

> even if defendant's assertions were true, it is unclear how these purported errors would run afoul of the doctrine of specialty.  Defendant is still being charged for the same illegal acts based on the same underlying conduct, that is, a 29 kilogram drug seizure and Blackberry messages showing his involvement with the drugs.

Docket No. 1117, at 6:16-20.

[6] In his Reply brief, Defendant states that "[i]f the evidence in support of the Continuing Criminal Enterprise was insufficient because tainted by the presentation of false testimony, then the presentation of sufficient evidence as to drug conspiracy or drug distribution [other counts against Defendant in the indictment] does not save the Continuing Criminal Enterprise charge from a doctrine of specialty challenge."  Docket No. 1119, at 10:25-11:2.  It is unclear where Defendant gets this standard or test from,

3

Moreover, while Defendant asserts that "Mexico likely extradited [him] only because facts were misrepresented" in the three declarations accompanying the extradition application, Docket No. 1114, at 7:13-16, this is entirely speculative even if the Court were to agree that there were misstatements in those declarations (a topic the Court ultimately sees no reason to address or resolve here given the other problems the Court has identified with Defendant's contention[7]).   The same is true regarding Defendant's statements in his Reply brief that "[h]ad the Mexican authorities not received false under oath statements from the government, it would likely have only found probable cause as to the drug conspiracy and drug distribution counts" and that "Mexico would consider the Continuing Criminal Enterprise offense as a separate and more serious charge."   Docket No. 1119, at 10:11-15, 11:6-8.   As explained further *infra*, Mexico had the information about Section 848 to reach that conclusion and to, perhaps, reach an agreement with the Government about any potential sentence to be imposed, but it apparently did neither of those things.

The only other case Defendant relies upon to support his reasoning here is *United States v. Fowlie*, 24 F.3d 1059 (9th Cir. 1994).   *See* Docket No. 1114, at 9:12-23.   The Court has reviewed the *Fowlie* decision and – apart from the fact that it also involved an extradition from Mexico in connection with a charge under 21 U.S.C. § 848, *see Fowlie*, 24 F.3d at 1063 – the Court cannot understand the significance Defendant apparently draws from that decision.   The case's discussion of the doctrine of specialty has nothing pertinent to say about Defendant's pitch for application of the doctrine here.   *See id.* at 1063-65.   Given that Defendant has not provided any pin-cite to *Fowlie* at all, it may be presumed that he realizes this fact.

Finally, Defendant appears to assert that the doctrine of specialty helps him here by providing him a basis to have the Court prohibit imposition of a mandatory minimum life sentence because the indictment does not allege factors that would give rise to that mandatory minimum "and the enhanced offense was not presented to the Mexican

---

as he provides no citation in support thereof.  If the supposed support is *Andonian*, the Court has its doubts, as expressed above.

[7] Even accepting Defendant's contention that the information contained in the declarations was knowingly false, how would a falsity about whether Defendant was "U.S.-based" impact whether Defendant was appropriately-extraditable for an alleged Section 848 violation?  Defendant does not meaningfully explain.

government for approval."  Docket No. 1114, at 9:27-10:1.  Similarly, he believes that count two should either be dismissed or that a 20-year mandatory-minimum cannot be imposed because the Government did not advise Mexico that the count was subject to such a mandatory-minimum.  Defendant cites no case supporting either of these sentencing-related contentions in association with the doctrine of specialty.

The Ninth Circuit has acknowledged that countries *can* agree to a sentencing limitation as part of an extradition (while also concluding that it was not – at least as of 2007 – clearly-established federal law that "unilaterally imposed sentencing conditions" expressed by the surrendering state are enforceable).  *See Benitez v. Garcia*, 495 F.3d 640, 644 (9th Cir. 2007).  At the same time, the Ninth Circuit has approved of a court's consideration of relevant, *uncharged*, offenses in applying an *upward departure* on a sentence for the extradited offense, even where the treaty in question prohibited punishment for non-extradited offenses.  *See United States v. Lazarevich*, 147 F.3d 1061, 1063-65 (9th Cir. 1998).  The Court is not aware of any obligation for the Government to spell out all possible sentencing consequences in connection with an extradition request, and *Lazarevich* at least strongly suggests that there is none (or at least none residing under the doctrine of specialty umbrella).  Given the lack of supporting citations from Defendant on this sentencing topic, the Court cannot see a basis to agree with Defendant that a doctrine of specialty-based problem exists here, in this regard.

Beyond those points, the Government notes in its Opposition that it attached a copy of 21 U.S.C. § 848, including a statement of the penalties for a violation of the statute, to the materials it submitted to Mexico.  *See* Affidavit in Support of Request for Extradition, Docket No. 1117-1, ¶¶ 7, 10, 14 & Exh. C.  Under *Benitez*, Mexico and the United States *could have* come to an agreement about one or more limitations on the sentence to be imposed in any prosecution of Defendant under that statute that resulted from the extradition.  But, apparently, they did not.  *See Benitez*, 495 F.3d at 644 (noting that Venezuela "relinquished custody" of the defendant even though it "could have refused extradition . . . until the United States agreed to the sentencing limitation").  There is no law that this Court is aware of by which the Court could impose such a limitation by way of the doctrine of specialty.

As a result of the foregoing, the Court denies Defendant's motion to dismiss to

the extent it is based upon the doctrine of specialty.

    2.  <u>Dual Criminality</u>

The United States-Mexico extradition treaty also incorporates the principle of "dual criminality." *See Soto-Barraza*, 947 F.3d at 1116; *Clarey v. Gregg*, 138 F.3d 764, 765 (9th Cir. 1998). That principle means that "'an accused person can be extradited only if the conduct complained of is considered criminal by the jurisprudence or under the laws of both the requesting and requested nations.'" *Soto-Barraza*, 947 F.3d at 1116 (quoting *Quinn v. Robinson*, 783 F.2d 776, 783 (9th Cir. 1986)). The Ninth Circuit has explained that it "'defer[s] to a surrendering sovereign's reasonable determination that the offense in question is extraditable.'" *Id.* at 1117 (quoting *United States v. Saccoccia*, 58 F.3d 754, 766 (1st Cir. 1995)). Obviously, Mexico determined that the offense in question was extraditable. However, even if such deference were not applied here, the Court agrees with the Government that no "dual criminality" problem is present.

"The principle of dual criminality does not require that the crimes be identical; rather, only the 'essential character of the acts criminalized by the laws of each country' must be the same, and the laws 'substantially analogous.'" *Soto-Barraza*, 947 F.3d at 1117 (quoting *Manta v. Chertoff*, 518 F.3d 1134, 1141 (9th Cir. 2008)) (omitting internal quotation marks); *see also Khan*, 993 F.2d at 1372 ("[D]ual criminality does not require that Pakistan have a provision that is the exact duplicate of [the statute charged in the American criminal action].")*; id.* at 1372-73 (observing that crimes that are "sufficiently analogous" have been held to satisfy the principle); *United States v. Merit*, 962 F.2d 917, 922-23 (9th Cir. 1992) (finding dual criminality "substantially analogous" requirement satisfied based upon South African Supreme Court's statement that "there is 'no difference in principle' between the Texas conspiracy count, which is very similar to the one in this case, 'and how it would be charged by a prosecutor in [South African] courts as a crime of fraud")*; Theron v. U.S. Marshal*, 832 F.2d 492, 496, 499 (9th Cir. 1987) ("Dual criminality focuses on the conduct made criminal in the requesting country and the asylum country. Dual criminality exists if the acts criminalized are of generally the same character and if the laws are substantially analogous.")*; cf. Matter of Extradition of Russell*, 789 F.2d 801, 804 (9th Cir. 1986) ("[T]he conspiracy charges are extraditable offenses because the *conduct* underlying the charges, as set forth in the affidavits, would

be cognizable under American federal and state criminal conspiracy law.").

"For two offenses to be substantially analogous, the court looks at whether '[t]he essential character of the transaction is the same, and made criminal by both statutes.' There is no need for the scope of criminal liability to be coextensive or the same in both the United States and [the] requesting country."  *United States v. Knotek*, 925 F.3d 1118, 1131 (9th Cir. 2019) (quoting *Wright v. Henkel*, 190 U.S. 40, 58 (1903)); *Manta*, 518 F.3d at 1141 ("The name by which the crime is described in each country and the scope of liability need not be the same."); *Clarey*, 138 F.3d at 765 ("Although some analogy is required, differences between statutes aimed at the same category of conduct do not defeat dual criminality.") (omitting internal citation).  As another way of putting it, "[i]t is immaterial whether one country's law is broader than the other, so long as 'the essential character of the acts criminalized is the same.'"  *Knotek*, 925 F.3d at 1131-32 (quoting *Yin-Choy v. Robinson*, 858 F.2d 1400, 1404-05 & n.2 (9th Cir. 1988)); *see also Clarey*, 138 F.3d at 766 (concluding that two statutes were sufficiently analogous "because they both punish acts of the same general character – the taking of another's life; no more is required").  A dissimilarity in elements does not prevent satisfaction of the "dual criminality" requirement, because "[w]hat matters is that the two country's [*sic*] laws are 'directed to the same basic evil.'"  *Knotek*, 925 F.3d at 1132 (concluding that the "same basic evil" in the case at hand was "the unwarranted use of threatening tactics for economic gain") (quoting *Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008)).

Defendant's sole "dual criminality" argument – he makes no attempt in his Reply to build upon the argument or to respond to the Government's Opposition on this issue, *see* Docket No. 1119, at 11:18-20 – is that Section 848 "has no analogy under Mexican law," apparently because a violation of Section 848 carries a mandatory minimum of 20 years and a maximum of life, whereas "under Mexican law, major drug trafficking is punishable for up to 25 years."  Docket No. 1114, at 10:20-23.  Even if Mexico does not have a statute specifically-directed towards a "continuing criminal enterprise" (or a "kingpin statute"), this does not convince the Court that the dual criminality principle is violated here given, at the very least, Defendant's acknowledgement that Mexico prohibits "major drug trafficking."  The "essential character of the acts criminalized" is plainly the same in both nations.  *See also United States v. Levy*, 905 F.2d 326, 328 (10th

Cir. 1990) ("Levy contends that [continuing criminal enterprise] is not an extraditable offense because of the lack of a crime in Hong Kong having analogous elements. . . . Levy was accused of being the leader of a cocaine trafficking operation. Such conduct is illegal in both Hong Kong and the United States, and satisfies the doctrine of dual criminality.").

As noted above, the Government provided Mexico with the information regarding the potential penalties for a Section 848 violation, and Mexico proceeded to extradite Defendant without coming to – or, to the Court's knowledge, attempting to come to – an agreement to limit the scope of sentence Defendant might face. *Soto-Barraza*, at a minimum, supports the view that this Court should presume Mexico knew what it was doing, and was aware of the extradition treaty's requirements, when it did so. As the Government argues in closing, "it would be anomalous for a court in the United States to tell another country that it made a mistake in applying its own extradition laws." Docket No. 1117, at 8:24-26. The Court agrees. *See also United States v. Lehder-Rivas*, 668 F.Supp. 1523, 1528 (M.D. Fla. 1987) ("By its request to Colombia, the United States proffered its belief that the Treaty encompasses CCE offenses. By clearing the extradition without reservation, Colombia affirmed this construction of the Treaty. . . . When the parties act as if CCE is within the category of crimes subject to extradition, this Court is not positioned to disagree."). It therefore denies Defendant's motion to dismiss to the extent based upon his "dual criminality"-based argument.

### 3. Due Process

As noted above, Defendant has provided no citation to any authority supporting his as-abbreviated-as-possible contention that his extradition was conducted in a way that deprived him of a fair hearing and due process. He is, in fact, having a hearing right now. To the extent the Government attempts to rely on what he believes to be false evidence in attempting to convict him, he will of course have an opportunity to assess, challenge, and discredit any such evidence. The Court will not make Defendant's arguments for him. His due process angle here fails.

### 4. Conclusion

For the reasons explained above, the Court denies Defendant's motion to dismiss.

### B. Motion to Suppress; Request for *Franks* Hearing

1. Standing

The first hurdle Defendant must clear in connection with his motion to suppress is standing. The Government argues both that Defendant has not filed a declaration in support of his motion under this District's Local Criminal Rule 12-1.1, and that he has not established the necessary statutory standing. The Government's observation about Defendant's failure under the Local Rules is undeniably accurate, as there is no declaration from Defendant on-record in association with his motion. *See* C.D. Cal. L. Crim. R. 12-1.1 ("A motion to suppress *shall* be supported by a declaration on behalf of the defendant, setting forth all facts then known upon which it is contended the motion should be granted.") (emphasis added). This, by itself, can be reason enough to deny the motion insofar as suppression is a requested remedy. *See, e.g.*, *United States v. Biden*, 728 F.Supp.3d 1054, 1084 (C.D. Cal. 2024); *United States v. Jennings*, No. CR 10-00346 SJO, 2011 WL 13143539, *2 (C.D. Cal. Mar. 24, 2011). Beyond that, Defendant appears to have another standing defect that he has not convincingly explained his way around.

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-20, "only 'aggrieved persons' as defined in section 2510(11) may move to suppress evidence obtained through electronic surveillance." *United States v. King*, 478 F.2d 494, 506 (9th Cir. 1973). In 1973, the Ninth Circuit – after acknowledging the importance of the "aggrieved persons" statutory category, and citing the Supreme Court's decision in *Alderman v. United States*, 394 U.S. 165, 176 (1969) – set forth the rule that "a defendant may move to suppress the fruits of a wiretap only if his privacy was actually invaded; that is, if he was a participant in an intercepted conversation, or if such conversation occurred on his premises." *King*, 478 F.2d at 506.

In 2012, however, the Ninth Circuit directly-quoted from the "aggrieved person" statutory definition (with a quotation from *Alderman*, 394 U.S. at 173, as support) to conclude that a person has standing to bring a motion to suppress in connection with a wiretap where that person "was a party to any intercepted wire, oral, or electronic communication *or a person against whom the interception was directed* (while saying nothing at all about premises where a conversation occurred). *United States v. Oliva*, 705 F.3d 390, 395 (9th Cir. 2012) (quoting 18 U.S.C. § 2510(11)). So far as the Court can tell, it does not appear that 18 U.S.C. § 2510(11) was amended in between 1973 and

9

2012.  Yet, *Oliva* never so much as mentions *King*.

As has been explained by the Ninth Circuit sitting *en banc*, one three-judge panel of the Ninth Circuit may not "overrule" an earlier three-judge panel, absent intervening Supreme Court authority indicating that the earlier panel was wrong.  *See Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc) ("[The panel decision] noted that a three-judge panel may not overrule a prior decision of the court.  That proposition is unassailable so far as it goes, but it does not take into account the possibility that our prior decision may have been undercut by higher authority to such an extent that it has been effectively overruled by such higher authority and hence is no longer binding on district judges and three-judge panels of this court."); *see also Cascadia Wildlands v. Scott Timber Co.*, 105 F.4th 1144, 1151 (9th Cir. 2024) ("As a three-judge panel, we are, of course, bound by circuit precedent.").  Defendant has not attempted to explain why this rule does not apply here in connection with the differences between *King* and *Oliva*. Indeed, like the *Oliva* decision itself, his Reply brief does not even contemplate the existence of *King*.[8]  The only two district court decisions this Court has been able to locate which attempt, in any fashion, to deal with the differing rules set forth in *King* and *Oliva* likewise do not recognize, let alone make an attempt to resolve or explain-away, the *Miller v. Gammie* issue presented by *King* and *Oliva*.  *See United States v. Giraudo*, 225 F.Supp.3d 1078, 1083 (N.D. Cal. 2016) (following *Oliva*, not *King*, because *King* – and other cases – "had no occasion to pass on whether a mere 'target of the surveillance' has standing under Title III") (omitting internal citation); *United States v. Matsura*, 129 F.Supp.3d 975, 980 (S.D. Cal. 2015) (reading *Oliva* as "accord[ing] standing to a defendant who was the primary user of the target telephones and a participant in the intercepted conversations," and concluding that "[t]his aspect of the circuit court's decision in *Oliva* is consistent with *Alderman*, *King*, and [*United States v. Cella*, 568 F.2d 1266 (9th Cir. 1977)], and did not effect a radical change in the law of standing in the Title III context").

Insofar as Defendant has not – at least thus far – successfully explained his way

---

[8] In his opening brief, before quickly pivoting to reliance on *Oliva*, Defendant cited *King* as support for the following sentence:  "An individual is an 'aggrieved person' if he was a participant in an intercepted conversation, or if such conversation occurred on his premises."  Docket No. 1115, at 17:2-7 (omitting stray internal quotation mark).

10

around the rule recognized in *Miller v. Gammie*, the Court at least tentatively agrees with the Government that Defendant has not established standing to move to suppress any material uncovered by the wiretaps used in this case. With that threshold problem, the question is what remains of the motion to suppress? He makes a request for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). He also makes an abbreviated argument – or at least includes a heading that reads – that "THE WARRANTS LACKED PROBABLE CAUSE AND SPECIFICITY." Docket No. 1115, at 18:23. The Court will address the latter first.

2.   Problems with "the Warrants"

Under his heading stating that "THE WARRANTS LACKED PROBABLE CAUSE AND SPECIFICITY," Plaintiff only actually addresses what he refers to as "[t]he first warrant." Docket No. 1115, at 18:24-29.[9] And his only argument with respect to that warrant is that it listed an email that was *later* attributed to Defendant, but "the government did not know the identity or role of the users of the requested emails" at the time the application was made. *Id.* He cites no authority in support of this abbreviated argument.

Defendant accurately notes in his Reply brief that the Government does not appear to have addressed this argument in its Opposition.[10] Appearing to take the Government's silence as an opportunity to build-out his argument, transforming a timely single-paragraph argument in his opening brief into three paragraphs in his Reply. Consistent with his opening brief, however, he still provides no citation to any authority in support of the argument. What Defendant does do in his Reply is assert that "[e]ssentially the government is just going off the fact that this is purportedly one of several secure phones sold to suspected drug dealer John Krokos." Docket No. 1120, at

---

[9] Defendant provides a list of the warrants that are nominally the subject of his motion in Exhibit A to the motion. *See* Docket No. 1115-1. The "first warrant" would be a warrant issued March 22, 2010, involving the account ford@halosecure.ro. *Id.*

[10] Without the Court's invitation to do so, the Government filed a "Further Opposition" to Defendant's suppression motion on June 18, 2025. *See* Docket No. 1123. While the Court might agree with the Government that Defendant's focus on any search warrant(s) in his motion was undeveloped, this does not support the Government's failure to address that argument entirely in its Opposition, nor an uninvited additional brief solely on that topic. The Court therefore declines to consider Docket No. 1123. Ultimately, however, as explained herein, Defendant's case for suppression of evidence gained from that warrant is unpersuasive, even without consideration of any argument from the Government on that point.

4:26-29.

The warrant application in question here was made pursuant to 18 U.S.C. § 2703. *See* Docket No. 1115-2, at pg. 2 of 46. Section 2703 provides, in part, that:

> [a] governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication, that is in electronic storage in an electronic communications system for one hundred and eighty days or less, only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction.

18 U.S.C. § 2703(a). Typical "probable cause" standards apply. *See, e.g., In re Search of Google Email Accounts identified in Attachment A*, 92 F.Supp.3d 944, 950-52 (D. Alaska 2015); *In re Application of the U.S. for a Search Warrant for Contents of Elec. Mail and for an Order Directing a Provider of Elec. Commc'n Servs. to Not Disclose the Existence of the Search Warrant*, 665 F.Supp.2d 1210, 1215 (D. Or. 2009). Thus, "'[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Fisher*, 56 F.4th 673, 683 (9th Cir. 2022) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

Defendant does not explain why linking the phone in question to Krokos – which Defendant, in his own telling, asserts is how the Government must be justifying the warrant's issuance, *see* Docket No. 1120, at 4:26-29 – is not, in and of itself, sufficient to establish probable cause for a search of that phone. Here, the issuing court was presented with information clearly tying Krokos to drug trafficking and clearly indicating that Krokos requested from an undercover agent, and was provided with, encrypted Blackberry devices tied to particular accounts (including ford@halosecure.ro) as part of his efforts and communications (including communications with undercover agents/identities) related to that drug trafficking. *See* Affidavit, Docket No. 1115-2, at pgs. 9-26 of 46, ¶¶ 2-3, 5, 7-8, 11-16, 18-28. The Government also explained that, at the time of the warrant application, it was unsure which of the devices (and which of the accounts) Krokos would use, "only that these [devices] assigned to [the subject accounts] will be used to communicate the Krokos[ drug trafficking organization's] future narcotics trafficking activities." *Id.* at pg. 28 of 46, ¶ 31. The Court has no hesitation in reaching

the conclusion that this established probable cause for a warrant connected to the device and account in question.  This is especially true considering the deference the Court is expected to apply to the probable cause determination.  *See, e.g.*, *United States v. King*, 985 F.3d 702, 707-08 (9th Cir. 2021) ("A 'magistrate's determination of probable cause should be paid great deference by reviewing courts.'  . . . Our duty is limited to ensuring that the magistrate had a 'substantial basis' for concluding that probable cause existed.") (quoting *Gates*, 462 U.S. at 236).

In his Reply, Defendant also attempts to add to his argument the assertions that the Government failed to show "that the warrant and its execution were accomplished with particularity and specificity"[11] and that "[w]e . . . do not have records of what was done to limit the collection of information to the justification for suspicion," meaning that, in his view, "this was a prohibited general warrant."  Docket No. 1120, at 5:6-14. Having failed to include *any* of these arguments in his opening brief, the Court will not consider them here.  *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

Defendant's arguments relating to any of the search warrants are insufficiently persuasive to warrant suppression of any evidence.

### 3.  *Franks*

In *Franks*, the Supreme Court held that:

> where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

438 U.S. at 155-56; *see also United States v. Flyer*, 633 F.3d 911, 916 (9th Cir. 2011) ("When requesting a *Franks* hearing based on allegations of material false statements or

---

[11] The Court does not consider Defendant's single use of the word "specificity" in a heading in his opening brief, *see* Docket No. 1115, at 18:23, to be a sufficient assertion (let alone a *developed* assertion) of an argument in that regard.

omissions in an affidavit supporting a search warrant, a defendant must make a 'substantial preliminary showing' that false or misleading statements were (1) deliberately or recklessly included in an affidavit submitted in support of a search warrant; and (2) 'necessary to the finding of probable cause.'") (omitting internal quotation marks) (quoting *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2011)); *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1985). To be entitled to a *Franks* hearing, the defendant needs to point out the specific aspects of the warrant that he or she deems false accompanied by a statement of supporting reasons. *Franks*, 438 U.S. at 171. Claims of negligence or mistake are insufficient. *See id.*

*Franks* reaches omissions too. *See United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1110 (9th Cir. 2005) ("To obtain a *Franks* hearing, defendants must make a preliminary showing that the wiretap applications contained material misrepresentations or omissions."). By reporting less than the total story, an affiant can still mislead an issuing judicial officer by manipulating the inferences that a magistrate will draw. *See United States v. Stanert*, 762 F.2d 775, 781, *amended by* 769 F.2d 1410 (9th Cir. 1985). Therefore, a defendant must 1) make a substantial showing that the affiant intentionally or recklessly omitted facts which may have misled the judicial officer, and 2) show that an affidavit supplemented with those omissions would be insufficient to support a finding of probable cause. *See id.* at 781-82. If the defendant is successful, the court must determine whether a supplemented affidavit would provide the judicial officer with a substantial basis for concluding that probable cause existed. *See id.* at 782.

The same *Franks* analysis applies in the context of a wiretap as well. *See United States v. Barragan*, 871 F.3d 689, 701 (9th Cir. 2017) (emphasis added); *Gonzalez, Inc.*, 412 F.3d at 1110. In that context, "[f]alse statements are material 'if the wiretap application purged of the false statements would not support findings of probable cause and necessity.'" *United States v. Christie*, 825 F.3d 1048, 1069 (9th Cir. 2016) (quoting *United States v. Staves*, 383 F.3d 977, 982 (9th Cir. 2004)); *see also United States v. Mittelman*, 999 F.2d 440, 444 (9th Cir. 1993) ("*Franks* is amenable to application in the wiretap context because inquiring into necessity and inquiring into probable cause are different versions of the same question.").

A scene-setting observation to be made here is that it appears that Defendant's

14

request for a *Franks* hearing concerns the July 13, 2010 affidavit of DEA Special Agent Rachel Burkdoll ("Burkdoll") supplied in support of the *wiretap* application, not any *search warrant* application. *See, e.g.*, Docket No. 1115, at 13:16-23.[12] That affidavit is part of the materials submitted as Exhibit A to the Government's Opposition brief. *See* Docket No. 1118-1. The Court has several reasons to doubt/questions regarding the sufficiency of Defendant's request for a *Franks* hearing in association with that affidavit and the wiretap application of which it was a part.

First, if Defendant is only asking for a *Franks* hearing with respect to the wiretap, and he has not demonstrated standing (under *King*) to challenge the wiretap, can he obtain a *Franks* hearing in connection with the wiretap? The authority on that issue that the Court has been able to discover suggests the answer is "no." *See, e.g.*, *United States v. Phua*, 100 F.Supp.3d 1040, 1055-56 (D. Nev. 2015); *United States v. Marcello*, 568 F.Supp. 738, 739 (C.D. Cal. 1983); *United States v. Galecki*, No. 2:15-cr-00285-KJD-PAL, 2016 WL 8716228, *2-4 (D. Nev. Sept. 19, 2016), *adopted*, 2017 WL 1330193 (D. Nev. Apr. 5, 2017); *United States v. Renzi*, No. CR 08-00212-TUC-DCB (BPV), 2010 WL 1962668, *1-2 (D. Ariz. Apr. 16, 2010) (Magistrate Judge Report and Recommendation), *adopted*, 2010 WL 1962644 (D. Ariz. May 14, 2010); *see also United States v. Roads*, 911 F.2d 739, 1990 WL 118906, *4 (9th Cir. Aug. 16, 1990) (unpublished opinion[13]). The briefs do not address or answer this question.

Second, Defendant has not come close to making a case that probable cause would be lacking if any alleged omissions/falsehoods (*see* Docket No. 1115, at 27:1-28:4) were excised from the wiretap application. For instance, Defendant asserts that the information about him from the confidential informant was "stale." *Id.* at 9:11-13. But, even if true, why would that eliminate probable cause for the wiretap of the device in

---

[12] If Defendant is instead attempting to establish that falsehoods were contained in the affidavit of the confidential informant offered in connection with that informant's 2022 affidavit made in support of Defendant's extradition, he has not established that affidavits supplied in connection with extradition proceedings give rise to a *Franks* procedure/remedy. To the extent he references that 2022 affidavit as – in the Court's reading of his briefing, a more-accurate assessment of his intent – a basis to call into question the July 2010 affidavit from Burkdoll filed in support of the wiretap application, how could an affidavit containing alleged falsehoods that was filed in 2022 demonstrate a knowing or reckless falsehood in a July 2010 affidavit from *a different affiant*? The Court does not see an explanation from Defendant on this point.

[13] *See* Ninth Cir. R. 36-3(a).

question?  A review of activity occurring on the device targeted by the wiretap – as the result of an earlier search warrant – revealed drug-related communications.  Similarly, if Defendant is correct that the wiretap application was false in its assertion that the confidential informant was, going-forward, "uninvolved and unable to infiltrate the alleged conspiracy," *id.* at 13:23, how would that impact the probable cause supported by information *already-gathered*?

Additionally, while Defendant asserts that "the government's vouching for the reliability of" the informant was reckless, *id.* at 15:24-26, he does not explain why one would reach this conclusion based on information known to Burkdoll in July 2010.  He contends that the informant was "known to be untrustworthy to Det. Fontecchio," *id.* at 27:19-22, but Detective Fontecchio was not the affiant – Burkdoll was.  If the informant lied in his 2022 affidavit in support of Defendant's extradition, *see id.* at 27:23-25, any such lie would not have been known to Burkdoll in 2010.  *See also* Footnote 12, *supra*.

Finally, Defendant asserts that Burkdoll's affidavit did not do a sufficient job of explaining that the informant was acting in his role as an informant, not as an insider-turned-cooperator, when he gathered information.  *See id.* at 27:5-7.  Again, the Court does not understand how any such omission (even if Defendant has accurately described it[14]), once corrected, would weaken (much less eliminate) the probable cause demonstration – much of which (as adequately-summarized in the Government's Opposition) stemmed from results obtained via execution of the earlier search warrant demonstrating drug-related conversations on the devices supplied by the Government to Krokos, consistent with information gathered from other drug-related communications occurring before that warrant's execution – for the wiretap.  Defendant certainly cites no case in support, let alone a comparable one.  *Cf. Frimmel Mgmt., LLC v. United States*, 897 F.3d 1045, 1052 (9th Cir. 2018) (concluding that Fourth Amendment had been violated where, among other things, detective had withheld fact that complainants were

---

[14] Burkdoll's affidavit described the informant as a person "who had been providing information" to a San Luis Obispo Sheriff's Department detective – Detective Fontecchio – "for about eight years," and revealed that the informant had provided information to the detective in the past in exchange for benefits in his own legal cases, was then providing information "in the hopes of obtaining lawful entry and permanent residence in the United States" (a hope that was quashed shortly before the affidavit's filing), and was being paid by local law enforcement agencies for expenses related to his cooperation.  *See* Docket No. 1118-1, Burkdoll Affidavit, ¶ 13 & n.6.

anonymous tipsters rather than confidential informants); *United States v. Meling*, 47 F.3d 1546, 1554-55 (9th Cir. 1995) (noting that a police investigation that presented substantial evidence supporting a finding of probable cause (independent of the information provided by the informant) would compensate for an informant's low credibility where an application for a warrant omitted a cooperating witness's/informant's criminal history).

Perhaps Defendant simply has not done a good enough job of "connecting the dots" for the Court here.  It is not the job of the Court to do that for him.  At this point in time, the Court is not convinced that a *Franks* hearing is warranted.

4. Conclusion

For the reasons explained above, the Court denies Defendant's motion to suppress and request for a *Franks* hearing.