

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - CENTRAL DIVISION

HONORABLE GEORGE H. WU, U.S. DISTRICT JUDGE

UNITED STATES OF AMERICA,

    Plaintiff,

  vs.       Case No. CR 12-527

JESUS FELIX-ALVAREZ,

    Defendants.

_____/

REPORTER'S TRANSCRIPT OF
MOTION TO DISMISS
Thursday, October 24, 2024
10:30 a.m.
LOS ANGELES, CALIFORNIA

_____

TERRI A. HOURIGAN, CSR NO. 3838, CCRR
FEDERAL OFFICIAL COURT REPORTER
350 WEST FIRST STREET, ROOM 4311
LOS ANGELES, CALIFORNIA  90012
(213) 894-2849

UNITED STATES DISTRICT COURT

**APPEARANCES OF COUNSEL:**

**FOR THE PLAINTIFF:**

UNITED STATES ATTORNEY'S OFFICE
United States Attorney
BY:  TIMOTHY J. SEARIGHT
     Assistant United States Attorney
United States Courthouse
312 North Spring Street
Los Angeles, California  90012

**FOR THE DEFENDANT:**

LAW OFFICE OF RICHARD W. RAYNOR
BY:  RICHARD W. RAYNOR
     Attorney at Law
407 North Pacific Coast Highway, Suite 280
Redondo Beach, California  90277
richard@richardraynor.com

**UNITED STATES DISTRICT COURT**

**WITNESS INDEX**

**WITNESS:**                                                    **Page**

**AGENT BURKDOLL**

**Direct Examination by Mr. Searight          6**

**Cross-Examination by Mr. Raynor            7**

**UNITED STATES DISTRICT COURT**

4

**EXHIBIT INDEX**

| EXHIBIT NO. | Page |
|---|---|
| **Government's Exhibit 1** | **7** |

**UNITED STATES DISTRICT COURT**

**LOS ANGELES, CALIFORNIA; THURSDAY, OCTOBER 24, 2024**

**10:30 a.m.**

**--oOo--**

THE COURTROOM DEPUTY:  Please come to order.

THE COURT:  All right.  Let me call the matter of *United States versus Felix-Alvarez.*

Let me have appearances, starting with the government.

MR. SEARIGHT:  Tim Searight on behalf of the government.

THE COURT:  All right.

MR. RAYNOR:  Richard Raynor on behalf of Jesus Felix-Alvarez.

THE COURT:  We are here on the motion to dismiss the indictment.

I issued a tentative on this.  I presume both sides have seen it?

MR. SEARIGHT:  Yes, Your Honor.

MR. RAYNOR:  Yes, Your Honor.

THE COURT:  Does somebody want to argue something?

MR. RAYNOR:  Your Honor, we would like to present testimony of Agent Burkdoll.

THE COURT:  Is she here?

MR. SEARIGHT:  We discussed this previously, she is

**UNITED STATES DISTRICT COURT**

remote.  She is on --

THE COURTROOM DEPUTY:  We're going to hear a loud noise.  I'm going to need to connect.

Agent Burkdoll, can you hear me?

We can't hear you.  I think she's in Europe, I'm sure there is definitely --

THE COURT:  I wonder if she could, like, can she hear me?

All right.  So can you see and hear us now?

THE WITNESS:  Yes, I can.

THE COURT:  Great.  Now, since this is going to be testimony, I presume we should be placing her under oath; is that correct?

MR. RAYNOR:  Yes, Your Honor.

THE COURT:  For the record, the defendant has already submitted his written waiver of in-person testimony from the particular witness involved, since she's located in Europe at this point in time.

So let me ask the clerk to swear in the witness.

THE COURTROOM DEPUTY:  Agent Burkdoll, please raise your right hand.

(Oath was administered.)

THE WITNESS:  I do.

AGENT BURKDOLL,

having been duly sworn,

UNITED STATES DISTRICT COURT

testified as follows:

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

BY MR. SEARIGHT:

Q    May I ask my preliminary questions?  Agent Burkdoll, do you have before you a declaration signed on September 6th, 2024?

A    Yes, I do.

Q    That is an 8-page declaration; is that correct?

A    Yes, that's correct.

Q    That is your signature that appears on page 8?

A    Yes, it is.

Q    Your Honor, I provided to you a government's one document, and the government will move that into evidence.

THE COURT:  For purposes of this hearing?

MR. SEARIGHT:  For this hearing.

THE COURT:  Let me make sure the defense counsel has a copy of it as well; is that correct?

MR. RAYNOR:  Yes, Your Honor.

THE COURT:  Great.  Anything else you want to inquire?

(Government's Exhibit 1 received into evidence.)

MR. SEARIGHT:  No, Your Honor.

THE COURT:  For the defense?

MR. RAYNOR:  Thank you, Your Honor.

**UNITED STATES DISTRICT COURT**

Your Honor, can I remove my mask for the purpose of this portion?

THE COURT:  Sure.

CROSS-EXAMINATION

BY MR. RAYNOR:

Q    Agent Burkdoll, you are the case agent in this case, the lead case agent?

A    Yes, I was.

Q    And at some point were you no longer the lead case agent?

A    I would not be considered the lead case agent because I'm not assigned to that office in the Ventura resident office at DEA, which maintains the case file.

Q    Now, you are aware of one of the defendants, Felix Estebon -- sorry, Jesus Estebon Felix, correct?

He was one of the defendants, correct?

A    Yes.

Q    And my client is his son; is that right?

A    Yes.  I believe that's a family relationship.

Q    Now, and you -- how was it that Mr. Felix, Jr., as I will call my client, how is it that he was arrested and brought and made his way to court?

A    I recall that he was arrested by Interpol in Mexico, but the details surrounding his arrest, I don't have.

Q    Do you know when he was arrested?  Approximately?

A    Yes, I believe it was either June or July of 2022.

UNITED STATES DISTRICT COURT

9

Q    And he -- and do you know the name on which he was listed on the Interpol warrant?

A    I didn't see a copy of the Interpol warrant, however, based on the information that we had submitted to them, it should have been Jesus Felix-Alvarez.

Q    Did you know Mr. -- sorry, Mr. Felix, Jr., to be a U.S. citizen?

A    Yes, I did.

Q    And you determined that his name was Jesus Felix-Alvarez, not based upon looking on any kind of official document, right?

          MR. SEARIGHT:  Objection.  Vague.

          THE COURT:  Do you understand the question?

          MR. RAYNOR:  Can I rephrase?

          THE COURT:  He's going to rephrase the question.

          THE WITNESS:  Thank you.

BY MR. RAYNOR:

Q    Had Mr. Felix, Jr., he was born in Los Angeles County, correct?

A    I remember he was born in California.

Q    Did you seek his birth certificate?

A    The HSI agents on the investigation, I believed had that information.

Q    And how is his name listed on his birth certificate?

A    I don't remember.

Q    Is it Jesus Estebon Felix, Jr.?

UNITED STATES DISTRICT COURT

A      I would have to look at the birth certificate.

Q      Have you seen it?

A      In the past, yes, but I don't recall at this time.

Q      It doesn't list his name as Jesus Felix-Alvarez, correct?

MR. SEARIGHT:  Objection.  Calls for speculation.

THE COURT:  I think it's been asked and answered, but you can attempt to rephrase it.

BY MR. RAYNOR:

Q      Did Mr. Felix, Jr., ever have an ID through the California Department of Motor Vehicles?

A      Yes, he did.

Q      And what was his name listed on his DMV identification?

A      I don't recall at this time.  I didn't review his identification materials prior to this hearing.

Q      Now, did you know where -- do you know what state in Mexico where Mr. Felix, Jr., was arrested?

MR. SEARIGHT:  Objection.  Withdrawn.

BY MR. RAYNOR:

Q      You can answer, if you know.

A      I might be guessing, again, because I wasn't there involved.

Q      Is it fair to say you really don't have much independent recollection of any of the events that any of the dates involved in this case, in any of the details in this case?

MR. SEARIGHT:  Objection.  Argumentative.

**UNITED STATES DISTRICT COURT**

THE COURT:  Rephrase the question.

BY MR. RAYNOR:

Q    Would you say that you forgotten a lot of the details of this case?

A    As -- I would have to refresh --

MR. SEARIGHT:  Objection.

THE COURT:  I would have to refresh my --

BY MR. RAYNOR:

Q    You would have to refresh your memory?

A    I have to refresh my memory regarding dates, but I remember events and things that happened in the case.

Q    So you remember, for example, that your evaluation was that Felix, Jr., was a translator for his father?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  I will sustain the objection.

THE WITNESS:  I know that message past to --

THE COURT:  Let me stop.  I sustained the objection so you don't have to respond.

BY MR. RAYNOR:

Q    Now, you had a chance to look at the declaration that was signed by the informant in this case, correct?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  I will overrule it.  We will see what the next question is, though.

BY MR. RAYNOR:

Q    Is the informant -- is the informant available to testify?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  Sorry.

MR. SEARIGHT:  The government objected to relevance grounds.

THE COURT:  Rephrase the question.

BY MR. RAYNOR:

Q    Is -- do you understand that the defense had sent a subpoena to the government and asked either know the whereabouts of the informant or have him produced to testify at this hearing?

MR. SEARIGHT:  Objection.  Relevance, causation, and speculation.

THE COURT:  I will allow the witness to answer that question if she understands the question.

THE WITNESS:  I know that defense had submitted a motion requesting that information.

BY MR. RAYNOR:

Q    Okay.  And were you aware that the defense was requesting that he appear for today?

THE DEFENDANT:  No.  I was under the impression that today's hearing was regarding the speedy trial motion.

BY MR. RAYNOR:

Q    Right, but did you understand the defense was seeking to have him testify?

MR. SEARIGHT:  Objection.  Asked and answered.

THE COURT:  I will sustain the objection.

BY MR. RAYNOR:

Q    Now, the request for -- had you -- were you involved at all in the declaration signed by the informant on -- it appears to be dated August 5th of 2022 or 8/5/2022, signed by the informant.

Did you review that before it went out?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  Rephrase the question.

BY MR. RAYNOR:

Q    Were you involved at all in obtaining the signature of the informant on the informant's declaration is support of request for extradition of Mr. Felix, Jr.?

MR. SEARIGHT:  Same objection.  Relevance.

THE COURT:  I will allow to her answer that question.

THE WITNESS:  No, I was not.

BY MR. RAYNOR:

Q    When was the last time I had contact with the informant?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  I will sustain the objection.

BY MR. RAYNOR:

Q    The -- are you familiar with that declaration that was signed by the informant relating to his statement of facts that

were used in support of the extradition of Mr. Felix, Jr.?

MR. SEARIGHT:  Objection.  Relevance, asked and answered.

THE COURT:  I will allow the witness to answer -- for her to answer that question, if she understands the question.

THE WITNESS:  Can you repeat that, please?

BY MR. RAYNOR:

Q    Are you familiar with the declaration signed by the informant that was submitted in support of the request for extradition of Mr. Felix, Jr.?

A    What year is the declaration?

Q    It says 8/5/2022.

A    Yes, I have seen it.

Q    Did -- would you say that -- when was of the last time you saw that?

A    I don't remember.

Q    Did you -- one was the last -- do you recall the last time it was that you spoke to the informant about the details of the case?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  Overruled.  I will allow her to answer that question if she understands it.

THE WITNESS:  It has been many years.  I was not the informant's handler.

BY MR. RAYNOR:

Q    So when was the last time you spoke to him?

A    It could have been 2009 or 2010.

Q    Did you talk to him at all about getting information about finding the whereabouts of Mr. Felix, Jr., after the indictment?

        MR. SEARIGHT:  Objection.  Withdrawn.

        THE COURT:  Okay.

        THE WITNESS:  It was many years, and I was not the informant's handler.  That my last communications with him were 2009 to 2010, and attempting to locate the defendant's whereabouts began in June of 2012.

BY MR. RAYNOR:

Q    Okay.  So you made no efforts to ask him about the whereabouts of Felix, Jr.?

        MR. SEARIGHT:  Objection.  Argumentative and asked and answered.

        THE COURT:  Rephrase the question.

BY MR. RAYNOR:

Q    Were you involved -- did the informant at any point provide you with information about where Felix, Jr. Was living?

A    When?

Q    At any point?

A    Yes.

Q    Okay.  And he told you sometime in 2009 or 2010, that Mr.

Felix, Jr., was living with his father, right?

A    Well, specifically the informant provided information about the whereabouts of the defendant's father.

Q    And in other words, he didn't know where Felix Jr., was, correct?

A    I don't remember discussing it with him.

Q    Now, you did discuss with the informant back in either 2009 or 2010 about the details of the information that he had about the involvement of Jesus Felix Leon and his son, Felix, Jr.?

        MR. SEARIGHT:  Objection.  Relevance.

        THE COURT:  I will sustain the objection.

BY MR. RAYNOR:

Q    Did you -- in this declaration from the informant in August 5th of 2022, that was approximately ten years after the indictment came out, correct?

        MR. SEARIGHT:  Objection.  Relevance and beyond the scope, Your Honor.

        THE COURT:  I will sustain the objection.

BY MR. RAYNOR:

Q    Is the declaration from Mr. Montoya Lopez consistent with what he told you in 2009 and 2010?

        MR. SEARIGHT:  Objection.  Relevance.  Also vague.

        THE COURT:  I will sustain the objection.

        MR. RAYNOR:  Your Honor, I would ask permission to

read a section of the informant's declaration, Paragraph 8 and then ask the witness some questions about that.

MR. SEARIGHT:  I would want to know the relevance of this as to the speedy trial motion.

MR. RAYNOR:  Your Honor, it has to do with the change in the informant's version of the events over time.

THE COURT:  What does it have to do with the location of the defendant?

MR. RAYNOR:  Well, okay.

It's actually -- this is actually skipping to another area, Your Honor.  There are two issues as we see them, the minor issue in which I think that the Court has suggested that there is overwhelming evidence is the issue of due diligence.

The second issue is actual -- whether or not there is actual prejudice.

And one of the issues claim here of actual prejudice is that the statement that was made ten years later by the informant is much different than his earlier statements, and about which there is new information that was never told to the agent and information that is different.

THE COURT:  I don't understand that has to do with what element of the speedy trial.

MR. RAYNOR:  Prejudice.  Basically not -- the fact that the witness's testimony changed over time, probably due to -- but basically because of the passage of time, you have a

witness.

No. 1, we don't even know if he's available, and No. 2, if he is, it appears that his testimony has changed.

THE COURT:  But I don't understand, I mean, with over time, sometimes the versions do change, sometimes they change a lot, sometimes they change a little, but what does that have to do with prejudice?

Are you saying that his most current version is somehow better for the government?

MR. RAYNOR:  Yes.

THE COURT:  But first of all, let me ask the government, is the informant available, do you know?

MR. SEARIGHT:  I will say, as I explained to Mr. Raynor, he is in the United States.  I have not had direct contact with him.

My understanding is that he does not want to be interviewed by defense counsel or an investigator, but he is in the United States.

THE COURT:  So, let me ask defense counsel, how does this go toward prejudice at all?

MR. RAYNOR:  Well, Your Honor, I believe if we had this witness on the stand, the informant on the stand, which we sent a subpoena to the government asking either that they give us information so we can serve him with a subpoena or that, alternatively, they make him available to testify.

We believe that --

THE COURT: What does that have to do with this motion?

MR. RAYNOR: We believe that it would -- his testimony on the stand here, we would be able to get to the truth with some cross-examination and some clarity.

THE COURT: I understand truth of what?

MR. RAYNOR: Your Honor, the essence of what we're attempting to do at this stage in terms of proving prejudice is to show that the informant basically, once he set up the arrangement between the Canadians and Felix Leon, that he acted as an interpreter.

I believe that the --

THE COURT: When you say he acted as an interpreter?

MR. RAYNOR: Sorry, that the informant acted as an interpreter, and then later that Felix Jr., basically took over that role of interpreter.

THE COURT: I still don't understand what that shows *vis-a-vis* prejudice.

MR. RAYNOR: Well, Your Honor, I think that if we have this witness here, we would be able to bring out this basically -- this parallel with the informant performing a role within the organization of interpreter, and then compare it to Mr. Felix, Jr., having that role of interpreter.

THE COURT: Again, I don't understand what this has

to do with prejudice.

MR. RAYNOR:  Well, because if we don't have that evidence available to present to a jury, then this -- he's --

THE COURT:  That doesn't have to do -- I don't understand what that has to do with anything.

In other words, the witness may or may not want to be interviewed by you or your investigator, well, that happens, but it doesn't have anything to do with this motion.

And, you know, his presence at the trial, you know, there is no indication he's going to be unavailable to testify or, conversely, doesn't have any evidence that he will be able to testify.  Again, I don't understand why that relates to prejudice insofar as this motion is concerned.

MR. RAYNOR:  Well, my hope was and by sending the subpoena to the government and asking either to produce him or allow us to have the information so we can serve him a subpoena, is that we can explore that his memory on the stand because basically its his loss of memory.

This is an issue we have to raise pretrial, if it's capable of being decided without a trial.

And therefore, exploring his memory and whether that has been lost, that is an issue for prejudice.  The loss of memory, that is one of the typical types of things.

When the defense has the burden, if there is no longer -- if there is not a presumption of prejudice, then we have to

come forward with some evidence that of actual prejudice, and clearly one of the things that is considered in the presumption of prejudice is the fact that time has past and memories have faded.

Here, he we're trying to show a specific example of memory fading.  And given that the informant is not here, even though we attempted to have him present, I'm attempting to do the best I can to make a record of the fading of memory and the changing of the story over time.

THE COURT:  Let me hear from the government counsel, what is your response?

MR. SEARIGHT:  We would continue to object on relevance.  This hearing is not what Mr. Raynor has said he wants to explore the memory of the witness.

And that is not the purpose of -- discovery is not a purpose of this hearing.  In addition, the subpoena was issued and government's provided the case law indicating that the subpoena process is also not to be used as a discovery vehicle.

MR. RAYNOR:  Your Honor, we're not attempting to use it as a discovery tool.

This is a specific paragraph that I want to reference in this declaration of the informant that we believe contradicts prior statements and shows that this is a specific example of this.

THE COURT:  Well, let me ask, is the government

**UNITED STATES DISTRICT COURT**

planning to call the informant as a witness in the criminal case, if it goes forward?

MR. SEARIGHT:  No.

THE COURT:  Okay.  If it doesn't call the informant as a witness, then --

MR. RAYNOR:  Your Honor, we want the informant, but we want him because he basically is going to say that he acted in a certain role *vis-a-vis* Felix Leon, my client's father, and that his understanding was that Felix Jr., was basically going to take over as an interpreter.

I think as the witness sits on the stand right now, likewise, we would basically say that her understanding is that Felix Jr., was that of an interpreter.

Your Honor, this is a very serious charge, the continuing criminal enterprise.  It carries a 20-year mandatory minimum, so we're trying to do whatever we can.

THE COURT:  But I don't understand, at this point in time we're here for a motion to dismiss based on speedy trial rights.

You are saying, well there is some -- there can be some potential for memory loss.

You want to explore that memory loss, I guess, with a witness the government doesn't intend to call, but that the defendant might want to call.

So I don't understand how it comes into play in the

**UNITED STATES DISTRICT COURT**

motion to dismiss.

MR. RAYNOR:  Well, Your Honor, it's with this passage of time, I mean, previously all of the statements prior to 2022, he never before said that he had with Mr. Felix, Jr., picked up drug money together.

And I would -- there is a lot of information that basically we would only be able to get if the informant were testifying.

THE COURT:  Again, I don't understand how that relates to this motion.  Let me ask the government counsel, do you understand what he's arguing?

MR. SEARIGHT:  I think what he's trying to do is explore trial issues.  I think that's what he is interested in doing.

I don't see the relevance of this to the speedy trial motion.

MR. RAYNOR:  Your Honor, I think that you have an initial story from the informant earlier on, before the passage of time, where he basically is saying that Felix Jr., is taking over the role of interpreter for Felix Jr.'s father, a role that previously the informant held.

THE COURT:  That is helpful to your client, right?

MR. RAYNOR:  That was helpful.

THE COURT:  If he submits a later declaration, which is not particularly helpful to your client, and you want to

explore that.

I still don't understand why this relates to the motion to dismiss for speedy trial.

MR. RAYNOR:  We're showing the Court that over time the witness's testimony has become more inculpatory and --

THE COURT:  It's become more inculpatory?  That's what I don't understand.  If you are going to be making the argument, and the government doesn't plan to call him, the government doesn't plan to call him, so I don't understand.

MR. RAYNOR:  We are saying the prejudice by the delay, if we had been calling him maybe seven years ago, all of his prior statements and what appeared to be his memory of things at that time were exculpatory, and an indication that Felix Jr., was an interpreter, and that's it.

And also --

THE COURT:  Well, let me just ask you again, the government doesn't plan to call the informant as a witness, and so you want to -- the defense may want to call the party as a witness, the informant as a witness, but I still don't understand what the argument of prejudice is *vis-a-vis* this motion?

MR. RAYNOR:  It just goes to loss of memory and change of memory over time.

THE COURT:  Well, let me put it this way, I don't really get it at this stage.

What else do you want to present for purposes of this hearing?

MR. RAYNOR:  I'd like to ask a few more questions.

THE COURT:  Sure.

BY MR. RAYNOR:

Q    Was anything done to locate Felix Jr., in the year 2012?

A    Yes, after he was indicted, yes.

Q    Okay.  Was there anything done in 2013?

A    Yes.

Q    Was there anything done in 2014?

A    I believe so.

Q    What was done in 2014?

A    We would have had -- in 2013, there may likely have been a medical leave in 2014.

Q    A medical leave?

A    Yes.

Q    I'm sorry?  What is that?

A    Yes.  What is a medical leave?

Q    Oh, you were on medical leave?

A    Yes.

Q    And do you know if anything was done in the year of 2014 to attempt to locate Felix Jr.?

A    It would have been --

MR. SEARIGHT:  Vague.  Anything to do be done.

BY MR. RAYNOR:

Q    Was any effort made by anyone on the law enforcement team to locate Felix Jr., in the year of 2014?

A    If so, because you are getting regular requests from the Office of International Investigations.  The AUSA and the HSI agents on the case.  They would have that information.

Q    Okay.  But you have looked at all of the efforts -- what was the last time you looked in terms of your efforts being involved in the due diligence to track down, find, locate, and arrest and bring Felix Jr., for appearance on this indictment?

A    So I will say, I didn't look through all of the records. I looked through all of the records that I have.

Q    And your records -- there is nothing in your records about doing anything in the year 2014 to locate Felix Jr.?

          MR. SEARIGHT:  Objection.  Vague.

          THE COURT:  I will allow the witness to answer that question, if she understands the question.

          THE WITNESS:  I don't remember whether -- whether there was a period that I was not specifically looking for the defendant.

     I found additional materials, you know, as we fell through because it spanned over a decade that we were looking for him.

     If there was issued a search warrant or something like that was done in 2014, I didn't author or write any of those.

BY MR. RAYNOR:

Q    There is nothing in your declaration about doing anything or anything being done either by you or by somebody else on the team to locate Felix Jr.?

A    I believe --

MR. SEARIGHT:  Objection.  Foundation.  I will withdraw.

THE WITNESS:  It doesn't necessarily mean -- I'm sorry.

BY MR. RAYNOR:

Q    Go ahead, and proceed.

A    It doesn't necessarily mean that nothing was done.  It could be that I made attempts and received negative results. And oftentimes when I received negative results on things, I do not write a report.

Q    Okay.  So but there is no record of anything being done that you are aware of anything being done in the year 2014 to locate Felix Jr.?

MR. SEARIGHT:  Objection.  Asked and answered.

THE COURT:  What was the answer to the question? Let me ask the witness to repeat the answer.

THE WITNESS:  I was on medical leave in 2014 for a large portion of that year.

THE COURT:  Okay.

BY MR. RAYNOR:

Q    Did the informant provide any information about Felix Jr.,

relating to conduct before he reached the age of 18?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  I will sustain the objection.

BY MR. RAYNOR:

Q    In your declaration that was submitted in opposition to this motion, you state in there that July of 2022 law enforcement databases and other notifications arrived indicating that Alvarez had been arrested on new drug charges in Mexico.

Is -- do you have any information that there have been any -- there has been any law enforcement contact with Felix Jr., after the indictment, other than his arrest on the Interpol warrant?

A    I don't know how I would know that.

Q    Well, okay.  What are the new charges you were referring to when you said that Alvarez had been arrested on new drug charges in Mexico?

A    So when I found out that he had been arrested, that was what was reported to me from our office that was closest to where he was arrested.

However, when we continued to ask what those charges were, we were never given an answer.

And I made two requests also to Interpol, so I don't know what the details were surrounding his arrest or why it happened.

**UNITED STATES DISTRICT COURT**

Q    Okay.  But you said under oath that he was arrested on new charges and so --

A    I was told that he was arrested on drug-related charges in Mexico, but I have not been able to identify what those were.

Q    So then why did you call them new charges, if you didn't know they were new charges or the original charges?

MR. SEARIGHT:  Objection.  Argumentative.

THE COURT:  I will allow the witness to answer that question if she understands it.

THE WITNESS:  It was my understanding that there was a drug case in Mexico, as to why he was arrested.

BY MR. RAYNOR:

Q    And do you have any information about drug charges of Felix Jr., ever being a suspect after post-indictment on any charges other than those in the indictment?

MR. SEARIGHT:  Objection.  Asked and answered.

THE COURT:  Overruled.  The witness can answer it if she understands it.

THE WITNESS:  Can you repeat the question, please?

BY MR. RAYNOR:

Q    Did -- are you aware of any charges or any investigations either by the United States or Mexico about involvement of Felix Jr., in drug charges after the date -- after the indictment was filed in this case?

A    So the only information I had was when he was initially

arrested.  It was part of a drug case in Mexico where this was related drugs in Mexico, but I was never able to identify what that investigation or case was or the details surrounding it.

BY MR. RAYNOR:

Q     Where did you get that information?

A     From our office in Mexico, when they relayed he had been arrested.

Q     Were they notified immediately of the arrest?

         MR. SEARIGHT:  Objection.  Calls for speculation.

         THE COURT:  Who is they?

         MR. RAYNOR:  The DEA.

         THE COURT:  Let me ask the witness, do you understand the question?

         THE WITNESS:  I do.

         THE COURT:  Okay.

         THE WITNESS:  But I don't know what the time frame was between when he was arrested and when Mexico found out -- our office in Mexico found out, I should say.

BY MR. RAYNOR:

Q     Do you have -- the DEA has offices in Mexico, correct?

A     Yes, they do.

Q     They have access to Court records, right?

A     That I don't know.

Q     Do they have -- is it -- so, do you know -- do you have any intelligence or informants or any information whatsoever

that Felix Jr., was involved in any kind of drug activity after the indictment was filed in this case?

MR. SEARIGHT:  Objection.  Asked and answered.

THE COURT:  I will sustain the objection.

BY MR. RAYNOR:

Q    When you first started looking -- well, you were not involved in looking for -- strike that.

When efforts were first made to attempt to locate Felix Jr., in Mexico, what was done was attempts were made to locate the father, Felix Leon, correct?

A    Our best information at the time was focused on devices that were being carried by his father.

Q    And because -- you had not been following prior to the -- let me ask you this:  Is there any planning that goes on prior to indictment to make sure you can locate the people that are located in the indictment?

MR. SEARIGHT:  Objection.  Relevance.

THE COURT:  I will sustain the objection.  Counsel, how much more time do you want?

MR. RAYNOR:  Five minutes at most.

THE COURT:  I will give you five minutes at most.

BY MR. RAYNOR:

Q    Prior to the filing of the indictment, was there -- was there any effort made by the prosecution team, including law enforcement, to have a location where an attempt could be made

to arrest Felix Jr.?

MR. SEARIGHT:  Objection.  Vague.

THE COURT:  I will allow the witness to answer the question if she understands it.

THE WITNESS:  Prior to the -- prior to the arrest dates on June 12th, starting in around, I believe, it was mid May or early May, we were obtaining GPS data, and trying to locate cell phones and locations that we had known for the defendant and his father to reside in.

BY MR. RAYNOR:

Q    Had you -- had you obtained records of the GPS location of Felix Jr., during the time that the investigation was going on pre-indictment?

A    Not at that time, because he was not using a device that we had identified.

Q    Were you ever able to geolocate him during the investigation?

A    We used other techniques to try to identify locations for him using electronics and social media accounts he was using.

Q    But there was never -- go ahead.

A    And then we obtained certain phone numbers later in the search for him.

     We tried to geolocate those as well.  We had certain issues, depending on the phones were located.

Q    So you have no geolocation data about him pre-indictment?

A    Well yes.  We had lots of GPS data for him from the initiation of the investigation when we were monitoring GPS -- BlackBerry devices he was carrying.

Q    And did you -- there was an assumption made in attempt to locate Felix Jr., at some point that he would be with his father, correct?

A    We were looking at family homes and locations that we knew that members of the family visited, and then GPS data that we were able to follow.

Q    Prior to beginning to attempt to arrest to locate an arrest Felix Jr., post-indictment, did you ever compare geolocation data of Felix Jr., and Felix Leon to see whether in fact they were together at pertinent times?

A    No, not during that time, because when we were receiving that data, it was at a period where the father was not taking a leadership role in the organization, and that the defendant had moved up and was trying to assume that role in place of his father.

Q    How many?

A    So there is -- I'm sorry.

Q    Please continue.

A    There were communications that were intercepted between the defendant and other members of the organization where he was trying to conceal from his father that he was distributing cocaine to them, because he did not want them to learn about

it, and they were making statements that they hadn't heard from the father in a while.

Q    Were there -- were there ever any other comparisons of geolocation of Felix Jr., and Felix Leon during any time in the investigation?

MR. SEARIGHT:  Objection.  Asked and answered.

THE COURT:  I will sustain the objection.

MR. RAYNOR:  Your Honor, may I have one moment?

THE COURT:  Sure.

BY MR. RAYNOR:

Q    At some point -- when was the first time that DEA asked the U.S. Marshals for assistance in locating Felix Jr.?

A    I believe it was January of 2013.  There is all of the mandatory paperwork that was filed in June of 2012.

Q    Isn't it true there was no U.S. Marshal case assigned for Felix Jr.?

MR. SEARIGHT:  Objection.  Vague.

THE COURT:  I will allow her to answer the question if she understands it.

THE WITNESS:  That's correct.  At the time the U.S. Marshals were not accepting, from what I recall, they were not accepting people -- fugitives who were overseas, who were believed to be overseas, unless we had more specific information in which to locate them.

BY MR. RAYNOR:

**UNITED STATES DISTRICT COURT**

Q    Wasn't one of the reasons that they were not able to assist was due to low man-power and staffing issues?

MR. SEARIGHT:  Objection.  Calls for speculation.

THE WITNESS:  No.

THE COURT:  You need to lay a foundation for her ability to answer that question.

BY MR. RAYNOR:

Q    You state in your declaration, it was due to low staffing, and marshals did not do more to assist?

A    No, that's not correct.

Q    Okay.  What is the reference to low manpower and staffing issues, concerning the Marshal Service in your declaration?

MR. SEARIGHT:  If you could ask counsel to direct her to a paragraph.

MR. RAYNOR:  Paragraph 20.

THE WITNESS:  No, I recall at that time was, as I mentioned, in June of 2012, the U.S. Marshals would not take his case or the father, so at that time -- at a later time based on my relationship that I had with some U.S. Marshals, I requested their assistance.

They gave a cursory exam of what I had done on this investigation, and they said they could offer -- they couldn't offer me any suggestions, and they couldn't do what would be considered a deeper dive on him, because he was not a U.S. Marshal-retained fugitive.

**UNITED STATES DISTRICT COURT**

BY MR. RAYNOR:

Q     But that had to do with low manpower, correct?

A     Yes, back later at a later time.  That was the reason they gave me because he's not assigned, he's not their responsibility.

Q     And Felix Jr., was not a priority for them, correct?

MR. SEARIGHT:  Objection.  Calls for speculation.

THE COURT:  I'm going to sustain the objection.

MR. RAYNOR:  Nothing further, Your Honor.

THE COURT:  Anything else from the government?

MR. SEARIGHT:  No, Your Honor.

THE COURT:  We can excuse the witness at this point?

MR. RAYNOR:  Yes, Your Honor.

THE COURT:  Witness is excused.  Thank you ever much.

THE WITNESS:  Thank you.

THE COURT:  Anybody else want to argue anything about the motion?

MR. RAYNOR:  Your Honor, I think during the witness's examination, I think we made our argument, and I think that we have presented all that we have.

THE COURT:  All right.  Anything else from the government?

MR. SEARIGHT:  No, Your Honor, thank you.

THE COURT:  All right.  The Court would adopt its

**UNITED STATES DISTRICT COURT**

tentative as its final on the motion.

The motion is denied.  Thank you.

(The proceedings concluded at 11:27 a.m.)

* * *

**CERTIFICATE OF OFFICIAL REPORTER**


COUNTY OF LOS ANGELES    )
                         )
STATE OF CALIFORNIA      )


           I, TERRI A. HOURIGAN, Federal Official Realtime

Court Reporter, in and for the United States District Court for

the Central District of California, do hereby certify that

pursuant to Section 753, Title 28, United States Code that the

foregoing is a true and correct transcript of the

stenographically reported proceedings held in the

above-entitled matter and that the transcript page format is in

conformance with the regulations of the judicial conference of

the United States.


Date: 30th day of June, 2025.



                         /s/ TERRI A. HOURIGAN
                         _____
                         TERRI A. HOURIGAN, CSR NO. 3838, RPR, CRR
                                Federal Court Reporter


**UNITED STATES DISTRICT COURT**