Richard W. Raynor (SBN 162289)
LAW OFFICE OF RICHARD W. RAYNOR
407 N. Pacific Coast Highway, Suite 280
Redondo Beach, California 90277
Tel.: (424)257-0284
Fax: (424)258-9462
e-mail: richard@richardraynor.com
Attorney for Defendant
Jesus Esteban Felix, Jr.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| United States of America, | Case No. 2:12-cr-00527-GW |
|---|---|
| Plaintiff, | |
| vs. | OBJECTIONS OF JESUS ESTEBAN FELIX, JR., TO THE PRESENTENCE INVESTIGATION REPORT |
| Jesus Esteban Felix, Jr., | |
| Defendant. | Sentencing Date:   January 8, 2026 |
| | Time:              8:00 a.m. |
| | Ctrm:              9D |

Defendant Jesus Esteban Felix, Jr., through counsel. Richard Raynor, hereby submits the following objections to the guideline calculations and material information contained in Presentence Investigation Report ("PSR") dated November 13, 2025, pursuant to Fed. R. Crim. Pro., Rule 32(f).

RESPECTFULLY SUBMITTED:     December 31, 2025.

_/S/   Richard Raynor_____
RICHARD W. RAYNOR
Attorney for Defendant
JESUS ESTEBAN FELIX, JR.

OBJECTION TO PRESENTENCE INVESTIGATION REPORT
1

OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

I.      INTRODUCTION:

The Indictment in this case centers around the Krokos Drug Trafficking Organization.  The head of that organization was John Krokos, a Canadian, who distributed powder cocaine within the United States and to Canada.  John Krokos had three separate groups of Canadian drug customers who he supplied.  He sourced the cocaine from Jesus Esteban Felix-Leon (herein after Felix, Sr.), and from other sources of supply.  Felix Sr. is the father of defendant Jesus Esteban Felix, Jr. (hereinafter "Felix, Jr.").

The informant had known Felix Sr. from serving prison time together in the same facility.  John Krokos was staying in Puerta Vallarta, Mexico looking for a source of supply.  Mr. Krokos met the informant, who was at that time living and working in Puerta Vallarta.  At Mr. Krokos' request, the informant made the introduction of Mr. Krokos (as cocaine distributor) to Felix, Sr. (as source of supply of cocaine).

To facilitate the distribution of cocaine to Krokos, Felix Sr. had a series of people he relied on to work with Krokos to carry out the transactions of getting cocaine from those delivering it to those buying it, and getting money from those paying for cocaine to persons designated by Felix, Sr.  These facilitators operated out of the Los Angeles area where the money and drug exchanges would take place.

At first this facilitator was Ichiro Tomatani-Guzman.  Then after Felix Sr. believed that Mr. Tomatani-Guzman was detected by law enforcement, Tomatani-Guzman left that role.

Felix Sr. then selected his brother in law Rigoberto Ortega-Guzman as the next facilitator.  Mr. Ortega-Guzman was the husband of Ofelia Cardenas Ortega-Alvarez, who was the sister of Felix, Sr.'s wife Delia Alvarez-Huerta.  Mr. Ortega-Guzman was supposed to facilitate the sale of 44 kilograms of powder cocaine.  He reportedly sold 15 kilograms for $342,000.  Then the DEA served

a search warrant at the home of Mr. Ortega-Guzman's son, Erick Ortega, where law enforcement recovered the remaining 29 kilogram balance of the 44 kilograms.  Mr. Ortega then falsely reported to others involved that law enforcement seized the entire 44 kilograms.  Mr. Ortega-Guzman intended to steal the $342,000.  Mr. Ortega-Guzman, against the advice of the DEA and his wife, decided that he would go to Mexico to attempt deal directly with Felix, Sr. to resolve the suspicion that Mr. Ortega-Guzman had stolen proceeds from the sale of 15 kilograms of powder cocaine.  Mr. Ortega-Guzman's son (Felix, Jr.'s first cousin) paid money as directed by Felix, Sr.  Felix Sr. then directed that an additional $59,980 be paid by Mr. Ortega-Guzman's son. When all money demanded was paid, Mr. Ortega-Guzman left Mr. Felix, Sr.'s home in Culiacan, Mexico.  Mr. Ortega-Guzman never returned to the United States, and remains a fugitive.  The government alleges that this incident by which this stolen money was recovered involved the kidnapping, torture, and demand for ransom for the release of Mr. Ortega-Guzman.

Lastly, Felix, Sr. brought in Carlos Javier Verdugo-Miranda as his new facilitator in Los Angeles

Because John Krokos did not speak Spanish well, and because Felix Sr. did not speak English well, the informant initially served in the role as interpreter for transactions conducted between Krokos and Felix, Sr.  According to the case agent, when the informant and Felix, Sr. parted ways, defendant Jesus Esteban Felix, Jr. took over the role as interpreter and person who would relay messages between Krokos and Felix, Sr.

Felix, Jr. was under 18 years of age during all of his alleged participation in drug trafficking referenced in the Indictment, except for the alleged conduct involving his uncle Rigoberto Ortega-Guzman in April/May/June 2011, at which time Felix, Jr. was 18.  After that period, Felix, Jr. is not alleged to have facilitated any further drug transactions.

The Indictment alleges that the conspiracy started at a date unknown, but lists the first overt

act as occurring on October 2009.  Mr. Felix, Jr. turned 17 in October 2009.  The indictment alleges that the conspiracy continued until June 6, 2012.  By that termination date of the conspiracy, Mr. Felix was 19 years old.  But by June 2012, Felix, Jr. had already been uninvolved with transactions for a year, as others continued to be involved.

II.      OBJECTIONS

A.      Objections to Application of Leadership Role Enhancement Under USSG §3B1.1(c)

Felix, Jr. objects to PSR ¶¶ 69, 70, 71, 72 to the application of a role enhancement under USSG §3B1.1(c) and the underlying finding in PSR ¶71 that Felix, Jr. was a manager or supervisor of "at least two co-participants in the conspiracy, including Ortega and I. Tomatani."  Accordingly, further objection is made to the Adjusted Offense Level under PSR ¶74 and the Total Offense Level under PSR ¶82, because those levels reflect a 2 level increase as a result of the application of an enhancement under USSG §3B1.1(c).

The PSR at first accurately describes the role of Felix, Jr., stating:

"[Felix Jr.] was bilingual, speaking English and Spanish, so he eventually took over for the CI as the  translator/conduit for communications between Krokos and Felix [Sr.] When Krokos needed to speak with Felix, he would typically send messages to [Felix Jr.] to translate between the two of them."
PSR ¶30.

But the PSR mistakenly concludes that Felix, Jr.'s "role in the conspiracy evolved over time" and "eventually stepped into his father [Felix, Sr.'s] role which included supplying Krokos with cocaine while coordinating and supervising the collection of profits."  The universe of information obtained by the government concerning the interaction of Felix, Jr. consists almost entirely of the seized and intercepted emails.  The separate communication between Felix, Jr. and Felix, Sr. were not intercepted.  The government carries the burden of proof to prove a role enhancement by a preponderance of the evidence. *United States v. Wilson*, 900 F.2d 1350, 1354 (9th Cir.1990).

OBJECTION TO PRESENTENCE INVESTIGATION REPORT
4

Without observing the communication between Felix, Jr. and his father, the government does not carry its burden to prove that Felix Jr.'s role evolved into the role held of Felix, Sr.  And in determining whether it was Felix Sr. in charge to the end, or whether Felix, Jr took over, it helps to look at what happened to money that was paid by Rigoberto Ortega-Guzman's son Erick Ortega concerning the last transaction involving Felix, Jr.  Initially $342,000 was collected from Erick Ortega which represented return of the drug proceeds  stolen by Rigoberto Ortega-Guzman  Felix, Sr..  Case agent Rachel Burkdoll testified at the grand jury that "…suddenly on June 30th, we started receiving intercepts between Felix [Sr.] and Ichiro where Felix [Sr.]wanted Ichiro to go and pickup this money [$59,980] from Ortega's family."  Transcript of May 31, 2012 Grand Jury Testimony of S.A. Rachel Burkdoll, p. 70. This shows that this additional money is demanded directly by Felix Sr. And where does that money go?  Case agent Burkdoll further testified that when $59,980 was collected from Ortega-Guzman's son Erick Ortega, that a co-conspirator "wired part of that money to Felix-Leon [Felix, Sr] in Mexico." *Id*. at p. 71.  There is no record of Felix, Jr. even being aware that his father sought additional money from Ortega-Guzman beyond the $342,000 which Ortega-Guzman attempted to steal.  This all points to Felix Sr. remaining in charge, behind the scenes, but coming out of the shadows to resolve a crisis.        Felix, Jr. was under age 18 during all the transactions except those involving Ortega-Guzman, which occurred over a period of a few months. And Felix Jr. was involved in no further transactions after the theft by Ortega Guzman, and subsequent payments of money demanded by Felix, Sr.  Yet Felix Sr. continued to be involved in the drug trade.  The government failed to establish that Felix, Jr. took over the role of his father. Therefore, the government has failed to meet its burden to establish the imposition of a role enhancement for Felix Jr.

Felix Jr. was not a manager or supervisor of Ichiro Tomatani nor of Ortega-Guzman.  Felix Jr. passed on information as a conduit from his father Felix, Jr. to Ichiro Tomatani.  Ichiro Tomatani was

the facilitator for the relationship between Canadian cocaine distributor Krokos and Mexican cocaine source of supply, Felix, Sr.  Ichiro Tomatani took direction from John Krokos, for example, in picking up Blackberry phones at the direction of John Krokos for use by the Krokos Drug Trafficking Organization.  Ichiro Tomatani would meet at times in person with Felix, Sr. in Mexico, and occasionally by phone.

Special Agent Rachel Burkdoll testified at the sentencing of John Krokos, that:

"There were multiple conversations that Krokos had where he was directing people like Tomatani and [other co-conspirators] where he was telling them specifically that he wanted them to have spotters during meetings in the parking lot to watch out for law enforcement, what phone codes that they should use, when the phone codes were going to change."
Document 544, p. 24.

The evidence supports the conclusion that Ichiro Tomatani received direction from both John Krokos and Felix, Sr. as facilitator for both of them.

And grand jury testimony by the case agent shows that when John Krokos was talking with Felix, Jr., Krokos knew that Felix, Jr. was merely a conduit for communication with Felix, Sr. Special Agent testified before the grand jury as follows:

Q.    I just want to take a step back. The CS informed you that when Krokos first started purchasing cocaine from Felix, the CS would serve as a translator or go-between relaying messages back and forth; is that correct?

A.    Yes.

Q.    But at a certain point, the CS stopped working with Felix; is that correct?

A.    Yes.

Q.    And in the investigation is it true that interception showed Alvarez [Felix, Jr.] communicating primarily with Krokos and not Felix directly?

A.    Yes.

Q.    And based on your investigation, why is that?

A.    Well, Alvarez was bilingual, so he would speak English and Spanish. And also he was typically easier to reach on his BlackBerry device. So Krokos would normally talk to three primary people which would be Alvarez, Ichiro, and a guy that we later identified as Carlos Javier Verdugo-Miranda.

Q.    Okay.

A.    And when Krokos needed to speak with Felix-Leon, he would send messages to Felix-Alvarez to translate for them because they both lived in Mexico.

Q.    And how would you know that Krokos would -- when he would send those messages, would want those messages to be relayed to Felix?

A.    He would typically include in the e-mail, like, "Can you ask M," which was the nickname for Felix-Leon, "Can you ask M about this' or "Find out about something else for me."  And then sometimes we'd see messages from Alvarez where he would say "The Lord of the Beaches asks you this." The Lord of the Beaches was a nickname that they used to describe Krokos.

Transcript of May 24, 2012 Grand Jury Testimony of SA Rachel Burkdoll, pp. 45-46/

This testimony confirms that John Krokos viewed Felix, Jr as a conduit to communicate with Felix, Sr.

Felix, Jr. likewise was a conduit to communicate with Rigoberto Ortega-Guzman during the short period when Ortega-Guzman was supposed to be a facilitator.  The government suggests that Felix Jr recruited his uncle Rigoberto Ortega-Guzman to play the role of facilitator in Los Angeles. But there is no reliable evidence to support this claim.  It was Felix Sr who brought in his brother in law to work as a facilitator.

"A defendant is properly considered as a manager or supervisor…if he 'exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or supervise lower-level participants.'") *United States v. Hertular*, 562 F.3d 433, 448 (2d Cir. 2009) (internal citation omitted).  Felix, Jr. did not recruit his uncle, nor was Felix Jr. consulted in the decision to involve his uncle.  And Felix, Jr merely was a conduit for messages

back and forth between his father and others.

Furthermore, the guideline comments concerning the background of 3B1.1 suggest that a role enhancement should not be applied in the calculation of the guidelines applicable to Felix, Jr. The comment states:

> "This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (*i.e.*, the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense. This adjustment is included primarily because of concerns about relative responsibility. However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility."

USSG §3B1.1, comment. (backg'd.)(Nov. 2025)

There is no evidence that Felix, Jr. tended to profit more than the average participant. Felix, Jr. never owned a home, whereas Felix, Sr. owned multiple homes. Felix, Jr. had a car but no other significant assets. Felix, Jr. was not more likely to recidivate in that Felix, Jr. was no longer involved in any transactions after Felix, Sr.'s falling out with Rigoberto Ortega-Guzman. In the year before the filing of the Indictment, Felix Jr. was no longer involved with his father's drug business. Felix, Jr became estranged from his father and did not see his father in the two years before his father's death. Felix, Jr. has gone for more than 10 years living in Mexico with no involvement in drug distribution. Therefore, Felix, Jr. does not fall within the category of persons who profit more and are more likely to recidivate because of a higher relative culpability.

     B.    <u>Objections to Application of Specific Offender Characteristics Enhancement under USSG §2D1.1(b)(2) and Related Findng of of Use of Violence or Credible Threats of Violence</u>

Jesus Esteban Felix, Jr. objects to PSR ¶¶ 62, 63, 64 to the application of the Specific Offense Characteristic for use of violence/credible threats under USSG §2D1.1(b)(2), and the underlying

finding in PSR ¶65 that Felix, Jr. used violence, made a credible threat to use violence, or directed the use of violence in furtherance of the offense.  Accordingly, further objection is made to the Adjusted Offense Level under PSR ¶74 and the Total Offense Level under PSR ¶82, because those levels reflects a 2 level increase as a result of the application of an enhancement under USSG §2D1.1(b)(2).

The PSR and the government's sentencing memorandum mention a number of statements attributed to Felix, Jr. that purport to be admissions of Felix, Jr. actually inflicting violence on Rigoberto Ortega-Guzman.  There are several reasons why this evidence is not reliable.

First, the government states that Felix, Jr. admitted to getting his uncle to admit his theft of the money, quoting Felix Jr as saying "I put a gun in his mouth and he cried."  Government Sentencing Memorandum, Document 1196, pp. 5-6, referencing trial Exhibit 182.  But this message was not authored by Felix Jr.  This email message is dated May 16, 2011, the day before the stolen $340,000 was recovered from Ortega-Guzman's son.  The email header shows that it was sent by "trojan@halosecure.ro" to "StoneSpecter@obscurefortress.com."   But Felix Jr. was not using "trojan@halosecure.ro" as his email nor did he send that message.  On July 3, 2011, an email is sent from  "trojan@halosecure.ro"  to  "chp9312@halosecure.ro"  (Ichiro  Tomatani-Guzman)  which translated from Spanish says "Good brother, just here watching TV with Jr.  And you, where are you at?"  See Exhibit A. (Original in Spanish reads: "Bien hermano aqui nomas viendo la tele aqui con Jr. Y usted onde anda?"  Bates KROKOS_017762.)  See Exhibit A, printout of email in Spanish.  That July 3, 2011 email was sent just two days after Rigoberto Ortega-Guzman last left the home of Felix, Sr.  This appears to be an email sent by Felix, Sr., referencing his son Felix, Jr. by his nickname "Jr.". Thus it appears that the May 16, 2011 email referencing a gun was likely authored by Felix, Sr., not Felix Jr.  Felix, Jr. never used a gun and never said he used a gun.

The other purported admission of actual use of violence by Felix, Jr. is reference to an email to John Krokos on May 16, 2011 stating "Right now I have a plastik (sic) garbage bag on his head

with some weed in it."  Sentencing Memorandum, Document 1196, p. 5, referencing trial Exhibit 173.  There is no further explanation about what this purported event.  Why was the marijuana in the bag?  Was the marijuana ignited?  Was this meant to simulate suffocation?  It sounds like something an 18 year who plays video games would say.  The context here is that others are going to blame Felix, Sr. for entrusting his dishonest brother in law to be involved in drug transaction.  Krokos was looking for his money.

But there are other instances where Felix, Jr. says things to others that turn out to not be true. For example, the government in its sentencing memorandum attributes a statement to Felix Jr that he sent an email to Ichiro saying:

> "We telling the uncle we are gonna let him go free but it's all bullshit. "We telling the uncle we are gonna let him go free but it's all bullshit. So he is gonna call the son to give the cash up with no worries that everything is gonna come out alright. That's what we making the tio think. So once your friend receives the cash let me know so we could keep going with this torture shit. "

*Id* at p. 5, referencing trial Exhibit 180.

But that is not what happened.  The final payment demanded by Felix, Sr. was made on June 30, 2011.  and the following day, Rigoberto Ortega-Guzman left Felix, Sr.'s home.  Mr. Ortega-Guzman is reportedly living his life in Mexico as fugitive on this case.  Thus, the claim – that Mr. Ortega-Guzman would be held after money demanded was paid – was not an accurate portrayal of how Mr. Ortega-Guzman was actually treated.

The government cites a claim attributed to Felix, Jr. that  there was a picture of Mr. Ortega-Guzman tied up.  But no such picture was sent.  Again, likely this was bravado to stave off protests by Krokos of inaction by Felix, Sr. against a thief. And as to additional amounts demanded beyond the return of the stolen $342,000, the government only detected demands by Felix, Sr., not Felix, Jr. There is no evidence that Mt. Felix, Jr. was privy to the details of that demand that was made and handled by Felix, Sr.

The government has provided in discovery photographs of Mr. Ortega-Guzman taken in Mexico in the years since 2011.  Felix, Sr. has passed away.  Mr. Felix Jr denies having done any harm to his uncle.  And Mr. Ortega's now ex-wife and his son are not willing to discuss anything about now fugitive Mr. Ortega-Guzman to provide any additional information about whether he was physically harmed during his time at Mr. Felix, Sr.'s home from May to June 2011.

As to the claim that Mr. Felix, Jr. made "credible threats" all of the purported threats were directed to persons who were not the target of the threats.  There is no evidence that Mr. Felix, Jr. communicated any threats directly to Rigoberto Ortega-Guzman, or to the wife or son of Mr. Ortega-Guzman.  And there are no emails that purport to be specific threats that Mr. Felix, Jr. requested to be communicated to Mr. Ortega-Guzman's family.

Because there is insufficient evidence that Ms. Felix used violence or made "credible threats" of violence to any victim, the Court should sustain the objection to the finding that Mr. Felix, Jr. is responsible for such allegations of violence under the guidelines.

C.   Objections to the Finding that Jesus Esteban Felix, Jr. is Ineligble for the Specific Offender Characristics Reduction ("Safety Valve" Relief) under USSG §2D1.1(b)(18) and USSG §5C.12  Because He Used or Threatened Violence in the Offense and Was a Manager/Supervisor of Others

Jesus Esteban Felix, Jr. objects to PSR ¶¶ 66, 67, to the failure to calculate eligibility for "Safety Valve" Relief under USSG §2D1.1(b)(18) and USSG §5C.12, and the underlying findings in ¶67 that he did not satisfy "Safety Valve" factors 2 (did not use violence during the offense) and 4 (he was not an organizer, leader, manager, or supervisors of others in the offense).  Accordingly, further objection is made to the Adjusted Offense Level under PSR ¶74 and the Total Offense Level under PSR ¶82, because those levels do not reflect a 2 level reduction pursuant USSG §2D1.1(b)(18).  Further Objection is made to PSR ¶138 for the failure to find that the criteria of USSG §5C.12 (factors 2 and 4) have been satisfied such that Mr. Felix, Jr. is not subject to a 10 year mandatory

minimum sentence.

The reasons in support of a finding that defendant did not use violence during the offense are found in section B, above.  The reasons in support of a finding that defendant was not an organizer, leader, manager, or supervisors of others in the offense are found in Section A, above.

D.    Objection to Finding that Jesus Esteban Felix, Jr. Does Not Qualify for a Two Level Reduction as a Zero Point Offender under USSG §3E1.1 Because of the Use or Credible Threats of Violence and Because of the Application of an Aggravating Role Adjustment Applied Pursuant to USSG §3B1.1

Jesus Esteban Felix, Jr. objects to PSR ¶¶ 78 and 81 for the failure to calculate a two level reduction under the Zero Point Offender provisions of USSG §4C1.1(c), and to the underlying findings in PSR ¶¶ 79 and 81 of use of violence or threats of violence, and to the underlying findings in PSR ¶¶ 80 and 81 that Mr. Felix, Jr. held a leadership role.

The reasons in support of a finding that defendant did not use or threaten violence during the offense are found in section B, above.  The reasons in support of no Aggravated Role Adjustment pursuant to USSG §3B1.1 are found in Section A, above.

V.    CONCLUSION:

Based upon the foregoing, and such other filings, arguments, and evidence presented before or at the sentencing hearing, Jesus Esteban Felix, Jr. requests that the Court sustain the above objections to the PSR.

RESPECTFULLY SUBMITTED:          December 31, 2025

                                                  /S/   Richard Raynor
                                                  RICHARD W. RAYNOR
                                                  Attorney for Defendant
                                                  JESUS ESTEBAN FELIX, JR.

OBJECTION TO PRESENTENCE INVESTIGATION REPORT
12