Richard W. Raynor (SBN 162289)
LAW OFFICE OF RICHARD W. RAYNOR
407 N. Pacific Coast Highway, Suite 280
Redondo Beach, California 90277
Tel.: (424)257-0284
Fax: (424)258-9462
e-mail: richard@richardraynor.com
Attorney for Defendant
Jesus Esteban Felix, Jr.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Jesus Esteban Felix, Jr.,<br><br>Defendant. | Case No. 2:12-cr-00527-GW<br><br>SENTENCING MEMORANDUM OF JESUS ESTEBAN FELIX, JR, SENTENCING LETTERS, AND SENTENCING EXHIBITS<br><br>Sentencing Date: January 8, 2026<br>Time:             8:00 a.m.<br>Ctrm:             9D |

Defendant Jesus Esteban Felix, Jr., through counsel, Richard Raynor, hereby submits the attached sentencing position, sentencing letters, and sentencing exhibits for consideration at the time of sentencing in this matter.

RESPECTFULLY SUBMITTED:          January 3, 2026.


/S/    Richard Raynor
RICHARD W. RAYNOR
Attorney for Defendant
JESUS ESTEBAN FELIX, JR.

SENTENCING MEMORANDUM

I.       INTRODUCTION:

February 9, 1999 was a turning point in the life of Jesus Esteban Felix, Jr. (hereinafter "Felix, Jr."). Felix, Jr. was six years old. Felix, Jr.'s sister was a newborn at 1½ months old. Felix, Jr. had his own room in the three bedroom single family home in Moreno Valley, California that Felix, Jr.'s father bought just a year earlier. The family was living together in one home: Felix, Jr. living together with his father Jesus Esteban Felix-Leon (hereinafter "Felix, Sr."), his mother Delia Alvarez Huerta, and his sister Natalia Felix. From outside appearances, Felix, Sr. was the head of household, working construction, and living the American dream of home ownership accomplished by hard work. But the events of that fateful morning would reveal the truth about the source of money, and reveal how Felix, Sr. put his family in harm's way for the sake of that profit, forever changing the family's life in the United States.

It was early in the morning. Felix, Jr. was asleep. He was awoken by a loud banging sound. He heard yelling and saw law enforcement officers in uniforms, guns out, storming inside the family home. Felix, Jr. saw both his parents handcuffed. Child Protective Services removed six year old Felix, Jr. and 44 day old Natalia Felix from the home.

Law enforcement officers seized stacks of U.S. currency, and about 80 pounds of marijuana. And inside six year old Felix, Jr.'s room police found a loaded 9mm handgun. Law enforcement noted that if Felix, Jr. had pulled up a chair, he would have been able to reach that gun. What kind of parent would hide a loaded handgun in a child's bedroom? Felix, Sr. did so.

This would become a theme in the relationship between Felix, Jr. and his father Felix, Sr. Felix Sr.; Felix, Sr. would use his son in to advance Felix, Sr.'s drug business, with no regard for the consequences for young Felix, Jr.

The parents were arrested, and prosecuted for drugs, weapons, and child endangerment. The

father went to prison and the mother was released in less than a year.  It would be years before the family would reassemble (to an extent) in Mexico.  Meanwhile, Felix Jr. lived with his aunt in Moreno Valley from ages 6 to age 14.  At ag 14, Felix, Jr.'s aunt brought him to Culiacan, Sinaloa, Mexico, to live with his parents and sister.

Felix, Jr. now stands convicted by a jury of one count of conspiracy to distribute cocaine, and one count of distribution of cocaine.  Prior to trial, the "phone count" charge was dismissed upon defense motion, because Felix, Jr. was age 17 at the time of that alleged offense, and the government failed to follow the procedural requirements of the Juvenile Delinquency Act.  "The Continuing Criminal Enterprise" count was dismissed on August 28, 2025 – 12 days before the commencement of trial.

Felix, Jr. separately presented Objections to the Presentence Investigation Report ("PSR"), which objections are likewise requested to be considered as factors in favor of a mitigated sentence under 18 U.S.C. § 3553(a).

Felix, Jr. now identifies the following as the primary grounds for a downward variance based upon mitigating factors:

1.      Felix, Jr. was acting at the direction his father Felix, Sr. whose love and support Felix, Jr. craved and whose wrath Felix, Jr. feared, such that Felix, Sr. bears much of the responsibility for Felix, Jr.'s involvement in case;

2.      Felix, Jr. was youthful (age 17 during most of the conspiracy period) such that the frontal cortex his brain was not fully developed, and he is therefore less culpable than a defendant whose brain was more developed (such as the other defendants in this case), and his father normalized criminal behavior to Felix, Jr, as an impressionable child;

3.      Felix, Jr. has demonstrated post-offense rehabilitation by his decade long lack of involvement in criminal activity (except for his own personal drug consumption) from the date of the

Indictment in 2012 to the date of his arrest in Mexico in 2022, and by demonstrated hard work earning an honest living;

4.     Felix, Jr. has affirmatively rebuked his father's request for further involvement the drug business from 2012 until Felix, Sr.'s death in 2018 (including no contact between Felix, Jr. and Felix, Sr. in the two years before Felix, Sr.'s death);

5.     Felix, Jr. has family obligations including taking care of his current partner and their child, which child was born just after Felix, Jr.'s arrest in Mexico on the extradition warrant on this case.  Felix, Jr. also has an obligation to provide financially for his 13 year old son by his first marriage.

6.     Avoiding sentencing disparities calls for a sentence that is no higher than the 10 year mandatory minimum, or less than 10 years if the Court finds that Felix, Jr. qualifies for "safety valve" relief.

II.    CIRCUMSTANCES OF THE OFFENDER

When Felix, Jr.'s mother Delia Alvarez became pregnant, she moved from King City, California, to southern California to live with members of her family in Pacoima.  She gave birth to Felix, Jr. in Sylmar, California.  Felix, Sr. was not yet ready to commit to live together as a family and remained in King City with his own mother.  But after more than a year, Delia Alvarez moved in with Felix, Sr. with their son Felix, Jr. to live in King City as a family.

Then when Felix, Jr. was 5 years old, he and his parents moved to Moreno Valley, California where his father bought a home for the family to live.

As described above, in February 1999, when his parents were both arrested, Felix, Jr., age 6, and his sister, age 1½ months, were removed from the home and sent to separate foster homes.  Then, Felix, Jr. and his sister were placed with Felix, Jr.'s aunt Maria Hernandez and her husband.  After

Delia Alvarez was released from custody, and attended parenting classes she was able to move in with her children at the home of Maria Hernandez.  Then, after about a year when Felix, Sr. was released from prison and deported, Delia Alvarez took her daughter to join Felix Sr. in Culiacan, Sinaloa, Mexico.  Felix, Sr. was again arrested in the United States on January 28, 2002 on drug charges, and was again deported to Mexico on May 17, 2004.

Felix Jr. was left behind with his aunt Maria Hernandez and her husband.  Felix, Jr. lived with his aunt and uncle from age 6 to age 14.  Attached as Exhibit B is a photo of Felix, Jr. at age 6.

From his uncle, Felix Jr. learned the value of hard work.  Felix Jr. would go with his uncle to construction sites on Saturdays as a helper, and his uncle would pay him for his time so Felix Jr. could earn spending money.  But then tragically, the uncle died in an accident.  Attached as Exhibit C is a photo of Maria Hernandez and her husband, and Felix, Jr.  That picture was taken about three months before the death of Maria Hernandez's husband; Maria Hernandez was pregnant with her daughter at that time. Also, with the death of his uncle, Felix Jr. no longer had a father figure at Maria Hernandez's home.  Maria Hernandez loved Felix, Jr. like a mother, but thinking about her obligations to her own daughter, she agreed to return Felix, Jr. to his parents in Culiacan, Sinaloa, Mexico.

Although Felix, Jr. was again re-united with his parents and his sister, his father was often absent for stretches of time.  Felix, Sr. enrolled Felix, Jr. in private school, and bought Felix, Jr. a car that Felix, Jr. could use to drive himself to school.

In February, 2009, when Felix, Sr. invited the informant to stay with Felix, Sr. for a month in Culiacan, Sinaloa, Mexico, Felix Sr. directed Felix, Jr. (then age 16) to drive the informant around anywhere that the informant wanted to go.  At trial, the informant described Felix, Jr. as a good kid and said that Felix, Jr. appeared to be un-involved in Felix, Sr.'s drug business.

Between 2009 and 2010, Felix, Jr. lived mostly with his mother and sister, with Felix, Sr.

SENTENCING MEMORANDUM OF JESUS ESTEBAN FELIX, JR.

5

living at a separate residence.

At age 18, Felix Jr. got married in June 2011, and soon thereafter he and his wife had a child. Felix, Jr. and his wife operated sushi restaurant together. Felix, Jr. was still immature, and was still very much a child himself. Felix, Jr. felt constant pressure from Felix Sr. to pick up money for his father, but Felix Jr. refused. Felix, Jr. began using drugs. In 2006, Felix, Sr.'s pressure campaign had come to a head. Felix, Jr. had a physical confrontation with his father in which Felix Sr. choked him. Felix, Jr. never saw his father after that falling out. Felix, Jr.'s relationship with his wife fell apart and they separated. Felix, Jr. moved to Michoacan, Mexico where he lived with his mother and his sister.

Felix, Jr. continued to do various types of jobs, working at a grocery store, seasonally harvesting fruit, working in construction, and working weekends as a chef preparing and selling sushi and chicken wings. See Exhibit D –photo of Felix, Jr. involved in papaya harvesting and sales. See Exhibit E – photo of Felix, Jr. doing construction work.

In 2021, Felix Jr. began a relationship with his current partner. They were expecting a child. Then on July 22, 2022, before the birth of their child, Felix, Jr. was arrested on the extradition warrant on the Indictment in this case. Felix, Jr. has never seen this son in person.

III.    CIRCUMSTANCES OF THE OFFENSE

The informant in this case met Felix, Sr. as inmates in the same prison. The informant was seeking immigration benefits by his cooperation with law enforcement in the United States. The informant was living and working in Puerta Vallarta, Mexico when he spoke to John Krokos, a Canadian looking for a Mexican source of supply of powder cocaine to supply to his Canadian customers. The informant introduced John Krokos (a cocaine distributor) to Felix, Sr. (a potential cocaine source of supply). Because Krokos didn't speak Spanish well, and Felix, Sr. didn't speak English well, and the informant was fluent in English and Spanish, the informant facilitated

communication between this Canadian cocaine distributor and this Mexican source of supply.

Krokos insisted that all persons in the chain of distribution with whom he would be involved use secure communications, "encrypted" Blackberry devices, which were designed to avoid law enforcement interception. The DEA arranged for the informant to offer Krokos a source for such Blackberry devices which devices Krokos could use with his associates. Such devices being offered were purported to have all functions disabled except for the email function. No voice. No text. No GPS tracking. But these devices offered to Krokos had GPS tracking and had a "back door" designed so that the emails could be captured by Title III interceptions, or the information collected by a search warrant from a DEA contractor who controlled the servers which hosted these devices.

Felix, Sr. used a facilitator in Los Angeles to carry out the exchanges of the money and cocaine in the Los Angeles area. The first such facilitator used by the two was Ichiro Tomatani-Guzman. Krokos requested that Tomatani-Guzman meet with the informant's "connection" to these "secure" devices – but Tomatani-Guzman was actually picking these devices up from a DEA undercover. These devices were then distributed to Krokos' network, at Krokos' direction, like a "Trojan horse."

The trial evidence in this case consisted mostly of such intercepted and seized emails.

At some point the informant's relationship with Felix, Sr. broke down, and Felix, Sr. decided that he would find another person who was fluent in English and Spanish...but this time someone he could trust. Felix, Sr. had such a person who he could trust…and control…his son Felix, Jr. who was 16 years old, about to turn 17.

The case agent, Special Agent Rachel Burkdoll, testified before the grand jury that Felix, Jr. took over the role of translator that was previously held by the informant. Transcript of May 24, 2012 Grand Jury Testimony of SA Rachel Burkdoll, pp. 45-46. Agent Burkdoll testified that Felix, Jr. was used because he was bilingual. And agent Burkdoll explained how the wording used by

SENTENCING MEMORANDUM OF JESUS ESTEBAN FELIX, JR.

Krokos and Felix, Jr. showed that Krokos "would want those messages to be relayed to" Felix, Sr., using Felix, Jr. as a conduit for Krokos' messages to Felix, Sr., and likewise a conduit for messages from Felix, Sr. to Krokos. *Id*. This role of Felix, Jr. is acknowledge by the PSR at ¶30 ("[Felix Jr.]…"was bilingual, speaking English and Spanish, so he eventually took over for the CI as the translator/conduit for communications between Krokos and Felix.")

The government initially charged Felix, Jr. with a Continuing Criminal Enterprise, suggesting that this 17 year old (and 18 year old during the last transactions with Ortega-Guzman as facilitator) was a teenage "kingpin." But the government dropped the "kingpin" charge on the eve of trial. But the government still claims that Felix, Jr.'s role evolved. And the PSR, at ¶71, has adopted the government's view in concluding that Felix Jr. "eventually stepped into his father, Felix's role which included supplying Krokos with cocaine while coordinating and supervising the collection of profits."

Although the early communications articulated words of Krokos to the effect "tell your dad this" or words by Felix, Jr. to the effect "my dad says that," later communications are more concise and there was no need to repeat the obvious – that Felix Jr. was a conduit for communication with his father.

Because of the nature of the evidence collected from Blackberry devices, and not from other devices such as Nextel push to talk two way radios and other phones, Felix, Sr.'s directions to Felix, Jr. are not captured. Therefore, looking at the email communications alone, without considering the context, could lead to a misimpression about the role of Felix, Jr.

The informant testified that, when they met (in early 2009), Felix, Jr. seemed like a nice kid who was un-involved in Felix, Sr.'s drug dealings. And there were no other informants who testified about Felix, Jr.'s role. And because Felix, Sr. died in 2018, he was not able to provide any further information about his son's role.

But other evidence gives context that suggests that Felix, Jr. was manipulated, bullied, and

controlled by his father.  Attached to this sentencing memorandum as Exhibit F are sentencing letters from Felix, Jr. and his family that provide further context.  Felix, Jr.'s mother Delia Alvarez Huerta describes how her relationship with her former husband Felix, Sr. was "marked by constant fighting, mainly due to his drug addiction, his violent temper, and his refusal to distance himself from bad influences."  Felix, Jr.'s sister says that she and Felix, Jr. "we were afraid of my dad" and "we had to obey his orders."

When the informant testified, he described how Felix Sr. was violent with the informant and that the informant was afraid of Felix, Sr.

And Felix, Jr. in his letter describes how he lived in fear and was "scared to say no."  Felix, Jr. describes a 2016 incident in which Felix Jr. stood up to his father and his father choked him.  Felix Jr. then moved to Michaocan in 2016, and never saw his father alive again.  His father died in 2018.  Felix, Jr. believes that his father continued to be involved in drug trafficking up until his death in 2018.

It all lines up.  Felix, Sr. was drug addicted with an explosive temper, who was very controlling.  Many people have expressed fear to say no to Felix, Sr. and how he controlled them.

In hindsight, Felix, Jr. feels used and manipulated and betrayed by his father for drawing Felix, Jr. into the drug trade.  Felix, Jr. just wanted his father's recognition and love.

Felix, Jr. looks back at his communications and is embarrassed and ashamed of what he did and said on his father's behalf.  Felix, Jr. at the time was instructed to make others think that theft of drug money from Felix, Sr. was to be taken seriously and would not be tolerated.

But Felix Jr. never communicated a threat to Rigoberto Ortega-Guzman or to Felix Jr's aunt or cousin.  And it was Felix Sr. who directly communicating with Ichiro Tomatani-Guzman to demand and collect additional money (approximately $60,000) on top of the recovery of the $342,000 which Ortega-Guzman had stolen.  Felix, Jr. did not learn about that demand at the time.

The events involving Ortega-Guzman was a turning point.  Although there was some discussion about additional transactions afterwards, Felix, Jr. soon separated himself from his father's drug business.

Felix, Jr. knew his father was a drug addict, having found personal use amounts of drugs, in his father's home and vehicles.  Felix, Jr. unfortunately also turned to the use of drugs.  Felix, Jr. has since acknowledged that drugs are destructive and destroys lives.

During all of the drug transactions alleged in the Indictment, except for those in the Spring/Summer 2011 (facilitated by Ortega-Guzman), Felix, Jr. was under age 18.

IV.     SENTENCING FACTORS

The calculated guideline sentence is greater than needed to achieve the purposes of sentencing.  A mitigated sentence is sufficient but not greater than necessary to achieve the purposes of sentencing.

A.     Seriousness of the Offense, Promote Respect for the Law,
Just Punishment

The offense itself is very serious in that the conspiracy involved large quantities of powder cocaine.  However, promoting respect for the law and achieving just punishment means that the sentence should be proportional and should take into account mitigating factors.

Father's Influence

Mr. Felix, Jr.'s upbringing was unstable in that he bounced around between parents, and his aunt, and back with parents.  From a very young age Felix's father was in and out of his life, but mostly an absentee father.  Felix, Jr's father was drug addicted with a volatile and violent temper, known to explode in fits of rage.  Felix, Jr. was afraid to say no to his father.  When Felix, Sr. was around, his influence on his son sewed seeds of destruction.  Felix, Jr. witnessed raids in in

household, his father being arrested and deported, but then as a young child Felix, Jr. was paid by his father count stacks of cash.  Felix, Sr. normalized of the "drug business" to his young son.  Felix, Jr.'s mother failed or was unable to shield her son from being drawn by his father in to his father's trade.

In *United States v. Salcido-Corrales*, 249 F.3d 1151 (9th Cir. 2001), the Ninth Circuit examined the relative culpability of the parties where a defendant father pulled in his 18 year old son into a drug deal with directions to carry out the exchange of drugs that the father had arranged with an undercover officer.  The Ninth Circuit approved upward adjustments and departures for the defendant, a father who involved his young son in a drug transaction, finding that "involvement of his son in his crimes took the case 'out of the heartland' of the applicable guideline, thereby justifying an upward departure [for the father] on that ground." *Id*. at 1156.  The Ninth Circuit reasoned:

> "A parent occupies a position of trust with respect to a child and will have, in many cases, substantial influence over the child's decisions. We do not find it improper for a district court to find particularly blameworthy the fact that a parent has brought his child into a criminal enterprise, and to rely on that fact as a basis for an upward departure."

*Id*. at 1155.

As a corollary, the fact that a child was influenced by a parent to be involved in the drug trade is a mitigating factor for the conduct of that child, taking the case "out of the heartland" of the application of the drug guideline.

Felix, Jr.'s Youthfulness

On November 1, 2025, departure grounds were eliminated from the guidelines.  Included among the departure grounds that were removed were the grounds of Youthfulness under U.S.S.G. §5H1.1 (November 1, 2024).  Although that guideline was removed as a departure ground, it is included in the U.S.S.G Appendix B (Part III), p. 191 (2025).  "[I]t is the Commission's intent that judges who would have relied upon facts previously identified as a basis for a departure will continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)."  U.S.S.G Appendix B (Part III), p. 133 (2025).

SENTENCING MEMORANDUM OF JESUS ESTEBAN FELIX, JR.

Felix, Jr. requests that the Court consider the following language from U.S.S.G. §5H1.1 as consideration for a grounds for a downward variance:

> "A downward departure also may be warranted due to the defendant's youthfulness at the time of the offense or prior offenses. Certain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful individuals generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals also are more amenable to rehabilitation."

U.S.S.G Appendix B, p. 191 (2025).

Felix Jr. was found guilty of a conspiracy for which the first overt act was alleged to have occurred was October 2009. That first alleged conduct was Krokos contacting a DEA undercover about the purchase of Blackberry devices. That month, Felix, Jr. turned age 17.

The conspiracy is alleged to have continued until June 6, 2012, at which point Felix, Jr. was age 19. But by that date, Felix, Jr. had been already been uninvolved with the conspiracy for about a year. The overt acts in the Indictment first allege conduct by Felix, Jr. while he was age 17 from July 15, 2010 to August 30, 2010. Then there was a break in activity. And then Felix, Jr. is alleged to be involved once again once Rigoberto Ortega-Guzman was the Los Angeles facilitator, for overt acts between the dates March 23, 2011 to May 17, 2011. These events were involved a single delivery of 44 kilograms to Mr. Ortega-Guzman (and related events). In other words, the alleged personal involvement of Felix, Jr., once he was no longer a minor, is alleged to have occurred over an approximate three month period.

The susceptibility to outside influence of youthful offenders certainly seems to be at play in the conduct of Felix, Jr. Here, Felix, Jr. was drawn into the conduct for which he was convicted by his father. And Felix, Jr. suffered from Adverse Childhood Experiences as he was exposed to intermittent abandonment by his father, exposed to an early morning raids at gunpoint, and exposure to his father's violent temper. These are all factors in mitigation that make a guideline sentence

greater than necessary to achieve this 3553(a) factor.

Notably, the record presents no evidence of Mr. Felix, Jr. conduct in the illegal transactions after 2012.

Therefore, achieving just punishment, and promoting respect for the law is accomplished even with a mitigated sentence.

### B.    Adequate Deterrence

The fact that Felix, Jr. has no criminal history, and the fact that he was not involved in drug trafficking in the decade before his arrest suggests that no additional time is required to deter Felix Jr. from committing future crimes.  Therefore, even a mitigated sentence will accomplish the sentencing purpose of adequate deterrence.

### C.    Protecting the Public

The circumstances that contributed to Mr. Felix, Jr. participating in the drug trafficking transactions have diminished such that the public will be adequately protected from future crimes even without any further incarceration.  The fact that Felix, Jr. has not been involved in any drug trafficking in the 10 years between the Indictment and his arrest, shows that Felix, Jr. is not a risk to re-involve himself in drug trafficking.  Felix, Jr. has spent from 2022 to the present in custody, never having seen his second son in person .  Felix spent the decade plus time from the Indictment to his arrest working lawful jobs such as fruit harvesting, working at a grocery store, construction work, and food preparation.  Upon release, Felix, Jr. intends to gain employment, and save money to start a food truck business.  Even before the death of his father, Felix, Jr. repudiated his father's influence. Now, Felix, Jr. is committed to raising his son, and being a part of the lives of his sons and his partner.

Therefore, this sentencing factor supports the imposition of a highly mitigated sentence.

D.    Provide Needed Correctional Treatment

Mr. Felix, Jr. would benefit from treatment services related to his history of substance abuse. The program would help Mr. Felix, Jr. from not only relapsing with his own health, but completely disengage him from any unhealthy and or recidivism patterns learned from his father.  However, this factor does not require additional or extended time in custody, as such treatment could be provided on an outpatient basis.

E.    A Sentence to Avoid Disparity

The Court is required by 18 U.S.C. § 3553(a)(6) to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  Here, John Krokos' was initially sentenced to 138 months, and reduced upon the granting of a compassionate release petition (raising issue re cancer diagnosis) by which his sentence was reduced to to 7.5 years.  Krokos was the most culpable in that he sought out the relationships and created the Krokos Drug Trafficking Organizaton that was at the center of this investigation.  Ismael Ichiro Tomatino-Guzman was sentenced to 120 months and he facilitator in Los Angeles responsible for accomplishing the exchange for most of the drugs distributed in this case.  Mr. Wakil was the only other defendant to go to trial.  Although he was initially sentenced to 20 years, upon reversal, he was resentenced to 120 months.  And Mr. Wakil had criminal history.  Felix, Jr. has zero criminal history points, and has numerous other mitigating factors.  No defendant in this case had more than 120 months actually imposed.  Therefore, avoiding sentencing disparities favors the imposition of a sentence of less than 120 months if "safety valve" applies, or a sentence of 120 months if "safety valve" relief does not apply.

V.    SAFETY VALVE RELIEF

There are five requirements to satisfy for "safety valve" relief to allow a sentence below what

SENTENCING MEMORANDUM OF JESUS ESTEBAN FELIX, JR.
14

would otherwise be the mandatory minimum.  18 U.S.C. § 3553(f).  These factors are:

1.      qualifying lack of criminal history – satisfied here because zero criminal history;

2.      defendant did not use violence or credible threats – ruling required on objection;

3.      offense did not result in death or serious bodily injury – satisfied because no evidence;

4.      defendant was not a leader or organizer – ruling required on objection;

5.      "safety valve" proffer.

If the Court sustains the objections to the role enhancement and violence/threats factors, then the only remaining issue is providing a safety valve proffer.  And that proffer may be provided "not later than the time of the sentencing hearing."  Therefore, if the Court finds that "safety valve" requirements 2 and 4 have been satisfied, Felix, Jr. is prepared to present his safety valve proffer at the time of the sentencing hearing either verbally or in a pre-prepared written proffer statement.

VI.      CUSTODY CREDITS FOR TIME HELD IN CUSTODY PENDING EXTRADITION

Felix, Jr. was arrested on July 21, 2022 on an Interpol warrant based upon the Indictment in this case.  Felix, Jr. was received into federal custody on this case by the U.S. Marshals on October 3, 2022.  Thus, Felix, Jr. has been in custody pending extradition for a total of 439 days.  Felix, Jr. was held those 439 days solely on for extradition on the Indictment in this case.  Felix, Jr. was not held by Mexican authorities on any other charges.  Therefore, those 439 days will not be credited against any other charges or any other sentence.

The statute governing custody credits provides that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences — (1) as a result of the offense for which the sentence was imposed… that has not been credited against another sentence."  18 U.S. Code § 3585(b).

"Authority to calculate credit for time served under section 3585(b) is vested in the Attorney

General, not the sentencing court." *United States v. Alexander*, 609 F.3d 1250, 1259 (11th Cir. 2010). Felix, Jr. is to properly be given credits for his 439 days in custody pending extradition. But that credit must be calculated by the Bureau of Prisons in the first instance. If the Bureau of Prisons fails to do so, the appropriate remedy would be to return to this Court with a petition pursuant to 28 U.S.C. § 2241 to correct the sentence. *Hughes v. Slade*, 347 F.Supp. 2d 821 (C.D. Cal. 2004).

However, to clarify that there are no contested facts, Felix, Jr. requests that the judgement reflect that the Court finds that:

"Felix Jr. has spent 439 days in official detention prior to the date the sentence commences, as a result of the offense for which the sentence was imposed that has not been credited against another sentence. Therefore, defendant Jesus Esteban Felix, Jr. qualifies for the calculation of 439 days of credits against his sentence in this case, which credits are to be calculated by the Bureau of Prisons in the first instance."

VII.    CONCLUSION:

Based upon the foregoing, the other filings and evidence presented at or before the sentencing hearing defendant, Mr. Felix, Jr. requests a mitigated sentence

RESPECTFULLY SUBMITTED:              January 3, 2026


                                     */S/    Richard Raynor*
                                     RICHARD W. RAYNOR
                                     Attorney for Defendant
                                     JESUS ESTEBAN FELIX, JR.